IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

MARCUS TELESFORD,

                  Plaintiff,

        v.

ANTHONY ANNUCCI, *et al.*,

                  Defendants.

_____

Civil Action No.
9:16-CV-0793 (BKS/DEP)

APPEARANCES:                    OF COUNSEL:

FOR PLAINTIFF:

MARCUS TELESFORD, *Pro Se*
02-A-0506
Elmira Correctional Facility
P.O. Box 500
Elmira, NY 14901

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN      CHRISTOPHER J. HUMMEL, ESQ.
New York State Attorney General     Assistant Attorney General
The Capitol
Albany, NY 12224


DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro se* plaintiff Marcus Telesford, a New York State prison inmate, has commenced this civil rights action against five individuals employed by the New York State Department of Corrections and Community Supervision ("DOCCS") pursuant to 42 U.S.C. § 1983. Plaintiff's complaint generally alleges that defendants violated his Eighth and Fourteenth Amendment rights by confining him in a cell with a plexiglass shield without first issuing him a misbehavior report or providing him with a deprivation order in accordance with New York State law.

Currently pending before the court is a motion brought by defendants seeking dismissal of plaintiff's complaint for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that defendants' motion be granted.

I.    BACKGROUND[1]

Plaintiff is a New York State prison inmate currently being held in the custody of the DOCCS. *See generally* Dkt. No. 1. While he is now confined elsewhere, at the times relevant to his claims in this action, plaintiff was held in the Upstate Correctional Facility ("Upstate") located in Malone, New York.[2] *Id.*

Plaintiff arrived at Upstate on August 28, 2015, and was housed in a cell "with a solid door with a plexi-glass shield over the front of the cell bars with a pad lock [sic] to keep it shut." Dkt. No. 1 at 3. On December 14, 2015, plaintiff filed a grievance complaining of the use of the cell shield without having first been issued a misbehavior report or otherwise provided due process for the cell shield, which, he contends, represented a disciplinary measure. *Id.* The use of the cell shield also allegedly impeded proper air circulation throughout his cell, agitating plaintiff's

---

[1]    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964).

[2]    Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined for twenty-three hours each day, primarily for disciplinary reasons. *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

breathing due to his pre-existing asthma condition. *Id.* at 4. Plaintiff alleged

in his grievance that the use of the cell shield violated 7 N.Y.C.R.R. §

305.6, his due process rights, and his rights under the Eighth Amendment

to be free of cruel and unusual punishment. *Id.*

On January 5, 2016, plaintiff received a response to his grievance

from "the grievance office." Dkt. No. 1 at 4. The response indicated that

"the cell shield over plaintiffs [sic] cell bar window will remain there for

security reasons." *Id.* Plaintiff appealed the grievance denial to defendant

Donald Uhler, the Superintendent at Upstate. *Id.* Defendant Uhler sent a

response to plaintiff stating, "'The grievant was interviewed by a security

supervisor and was told the cell shield will remain secured for security

purposes per deputy superintendent of security.'" *Id.* As identified in

plaintiff's complaint, defendant Scott Woodruff served as the Deputy

Superintendent of Security at Upstate during the relevant times. *Id.* at 2.

Plaintiff also wrote to defendant Donald Venettozzi, the DOCCS

Director of the Special Housing Unit on January 4, 2016. Dkt. No. 1 at 4. In

that communication, plaintiff stated that "'the executive administration at

Upstate . . . was violating [his] fundamental constitutional rights by placing

a plexi-glass cell shield covering over the front of the cell bars without

giving [him] a misbehavior report or giving [him] a deprivation shield

4

order.'" *Id.* According to plaintiff, defendant Venettozzi responded by letter, explaining that "the facility officials at Upstate . . . are in the best position to respond to [his] concerns[.]" *Id.* Plaintiff alleges that, although defendant Venettozzi possessed "the executive authority to do so," he failed to "tak[e] any corrective action" to cure the constitutional violations. *Id.* at 4-5.

By notarized letter dated December 22, 2015, plaintiff informed defendant Anthony Annucci, the former Acting Commissioner for the DOCCS, that "the executive administration at Upstate . . . are violating the plaintiffs [sic] constitutional rights by unjustly placing a plexi-glass shield covering on [his] cell[.]" Dkt. No. 1 at 5. There is no indication in the complaint regarding whether plaintiff received a response to that letter. Plaintiff did thereafter send to defendant Annucci a "Section 75 Civil Service complaint" on June 23, 2016,[3] complaining of the use of the cell shield, and accusing defendants Uhler, Venettozzi, and Woodruff, as well as defendant Captain Zerniak,[4] of violating his constitutional rights. *Id.* Plaintiff alleges that he did not receive a response to his civil service complaint from defendant Annucci. *Id.*

---

3    While plaintiff's reference to a section 75 civil service complaint is unclear, it appears that he may have attempted to invoke New York Civil Service Law § 75, which provides a procedural mechanism for disciplining certain civil service employees.

4    Plaintiff's complaint identifies defendant Zerniak as the Captain of Security at Upstate. Dkt. No. 1 at 2.

According to plaintiff, he has been housed in a cell with a cell shield at Upstate from August 28, 2015 through June 30, 2016, and "ongoing." Dkt. No. 1 at 7. Plaintiff alleges he has suffered physical and mental injuries as a result of the use of the cell shield. *Id.* at 6.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on or about July 1, 2016, by the filing of a complaint accompanied by an application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. Following the court's review of those documents pursuant to 28 U.S.C. §§ 1915(e), 1915A, I accepted plaintiff's complaint for filing on July 29, 2016. Dkt. No. 6. Liberally construed, the complaint asserts an Eighth Amendment conditions-of-confinement claims and a Fourteenth Amendment due process claim against all of the named defendants. Dkt. No. 1 at 6-8. As relief, plaintiff seeks, *inter alia*, money damages, as well as costs for bringing this lawsuit. *Id.* at 9.

Following service of process, defendants filed the currently pending motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 19. In their motion, defendants contend that plaintiff's complaint fails to allege sufficient facts plausibly suggesting that each of the defendants was personally involved in the underlying constitutional violations and that the pleading fails to allege cognizable Eighth and

Fourteenth Amendment causes of action. *See generally* Dkt. No. 19-1.

Defendants' motion, to which plaintiff has responded in opposition,

Dkt. No. 23, is now fully briefed and ripe for determination and has been

referred to me for the issuance of a report and recommendation pursuant

to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule

73.2(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Legal Standard Governing Motions to Dismiss Pursuant to
         Rule 12(b)(6)

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6)

of the Federal Rules of Civil Procedure, calls upon a court to gauge the

facial sufficiency of that pleading using a standard which, though

unexacting, "demands more than an unadorned, the-defendant-unlawfully-

harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554,

555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a

pleading must contain a 'short and plain statement of the claim showing

that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. 677-78 (quoting Fed.

R. Civ. P. 8(a)(2)). While modest in its requirements, that rule commands

that a complaint contain more than mere legal conclusions. *See Iqbal*, 556

U.S. at 679 ("While legal conclusions can provide the framework of a

complaint, they must be supported by factual allegations.").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555-56); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). The tenet that a court must accept as true all of the allegations contained in a complaint does not apply, however, to legal conclusions. *Iqbal*, 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Ruotolo v. City of N.Y.*, 514 F.3d 184, 188 (2d Cir. 2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop,

particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson*, 551 U.S. at 94 ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (citation omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("[W]hen a plaintiff proceeds *pro se*, a court is obliged to construe his pleadings liberally." (quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.*, 804 F. Supp. 2d 100, 104 (N.D.N.Y. 2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

B.    Plaintiff's Eighth Amendment Claim

In his complaint, plaintiff asserts an Eighth Amendment conditions of confinement claim pursuant to 42 U.S.C. § 1983 arising from allegations that, by confining him to a cell with a plexiglass shield covering the door, he was subject to cruel and unusual punishment. Dkt. No. 1 at 2, 6-8; *see also* Dkt. No. 23 at 12. Defendants contend that this claim is subject to dismissal because the use of a shield cell "does not deprive an inmate of a basic human need, wantonly inflict pain, or unnecessarily put an inmate's health at risk." Dkt. No. 19-1 at 12.

1.    <u>Legal Standard</u>

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or 'involve[s] the unnecessary and wanton infliction of pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (citations omitted)). While the Eighth Amendment "'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)); *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).

A claim alleging that prison conditions have violated the Eighth Amendment must satisfy both an objective and a subjective requirement. *Walker*, 717 F.3d at 125; *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996). To satisfy the objective element, "the plaintiff must demonstrate that the conditions of his confinement result in 'unquestioned and serious deprivations of basic human needs.'" *Jolly*, 76 F.3d at 480 (quoting *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985)); *see also Walker*, 717 F.3d at 125 ("To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable

10

risk of serious damage to his health."). In a prison setting, basic needs include "food, clothing, medical care, and safe and sanitary living conditions." *Walker*, 717 F.3d at 125 (*citing, inter alia, Rhodes*, 452 U.S. at 347). As to the subjective requirement, "the plaintiff must demonstrate that the defendants imposed those conditions with 'deliberate indifference.'" *Jolly*, 76 F.3d at 480 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *see also Walker*, 717 F.3d at 125; *Waldo v. Goord*, No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.).[5] Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; [he] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see also Walker*, 717 F.3d at 125; *Waldo*, 1998 WL 713809, at *2.

  2. <u>Analysis</u>

  With respect to the objective element of the controlling Eighth Amendment test, plaintiff's complaint fails to allege facts plausibly suggesting that he was deprived of basic human needs by having

---

[5] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

plexiglass cover the opening to his cell door. Indeed, at least one court in this circuit has concluded that the use of plexiglass cell shields does not amount to cruel and unusual punishment under the Eighth Amendment. *DeMaio v. Mann*, 877 F. Supp. 89, 93 (N.D.N.Y. 1995) (Kaplan, J.). Plaintiff's additional allegations that the cell shield caused restricted air circulation and agitated his pre-existing asthma condition do not elevate the claim to plausible under Rule 12(b)(6). The Supreme Court's focus in the Eighth Amendment context has been, and continues to be, on whether an inmate's conditions of confinement impose "unnecessary and wanton infliction of pain," *Gregg*, 428 U.S. at 173, or offend "evolving standards of decency that mark the progress of a maturing society," *Rhodes*, 452 U.S. at 346. In this case, while plaintiff's complaint briefly mentions that the cell shield restricted air circulation and, therefore, his asthma condition was triggered, there are no other allegations in the complaint detailing the consequences of the cell shield, either with respect to the conditions in his cell or his health. Without more, plaintiff's complaint fails to plausibly allege conditions that pose "an unreasonable risk of serious damage to his health." *Walker*, 717 F.3d at 125.

Moreover, I remain mindful that the courts in this circuit that have determined that asthma constitutes a sufficiently serious medical condition

in the context of an Eighth Amendment deliberate medical indifference

cause of action have done so only when presented with evidence that the

plaintiff's asthma was so severe as to cause him to suffer from attacks.

*See, e.g., Scott v. DelSignore*, No. 02-CV-0029, 2005 WL 425473, at *9

(W.D.N.Y. Feb. 18, 2005) ("The mere fact that an inmate has an asthmatic

condition does not necessarily mean that the inmate has a serious medical

need, although an actual asthma attack, depending on the severity, may

be a serious medical condition."); *Patterson v. Lilley*, No. 02-CV-6056,

2003 WL 21507345, at *4 (S.D.N.Y. June 30, 2003) ("Being an asthmatic

(a person susceptible to asthma attacks) is not a condition, in Eighth

Amendment parlance, that is severe or 'sufficiently serious.' The existence

of the condition is distinct from the situation in which an inmate is suffering

an actual attack."). In contrast, plaintiff's complaint here merely alleges

that he suffers from "agitation [sic] breathing do [sic] to severe asthma."

Dkt. No. 1 at 4. Accordingly, without any additional facts, I conclude that

the allegations in plaintiff's complaint fail to plausibly allege sufficient facts

to satisfy the objective element of an Eighth Amendment claim.

Turning now to the subjective element,[6] there are no allegations in

---

[6]     Although the absence of any allegations in the complaint satisfying the objective
element of an Eighth Amendment claim would be appropriate grounds on which to
recommend dismissal, out of an abundance of caution, I have considered whether the

the complaint that plausibly allege defendants acted with the requisite deliberate indifference. Plaintiff alleges only that defendants Annucci and Venettozzi were "grossly negligent" in allowing their subordinates to place plaintiff in cell with a plexiglass shield. Dkt. No. 1 at 6-7. Negligence, however, is not actionable under the Eighth Amendment. *See, e.g., Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) ("[N]egligence is insufficient to support an Eighth Amendment claim.").

With respect to defendants Woodruff and Zerniak, there are no allegations in the complaint that they acted with the requisite mental state. Plaintiff's complaint merely alleges, as against both of those defendants, that they "violated [his] . . . Eighth Amendment rights to be free from cruel and unusual punishment when [they] placed [him] in a cell with a cell shield over the cell bars without a cell shield order or without giving [him] a misbehavior report[.]" Dkt. No. 1 at 8. A conclusory allegation such as that is not sufficient to satisfy the pleading requirements for stating an Eighth Amendment cause of action. Moreover, because there are no facts in the complaint that plausibly allege that either defendant Woodruff or Zerniak was aware of plaintiff's asthma condition, there is no basis to conclude that those individuals housed plaintiff in a cell with a plexiglass shield with

---

complaint contains allegations satisfying the subjective element, as well.

deliberate indifference to his medical condition.

Turning now to defendant Uhler, there are no allegations in plaintiff's complaint that he acted with knowing disregard for plaintiff's health or safety in denying plaintiff's appeal of his grievance. Plaintiff alleges that he filed a grievance complaining of the cell shield because, *inter alia*, it restricted air circulation and agitated his asthma. Dkt. No. 1 at 4. When the grievance was denied by the "grievance office," he then appealed it to defendant Uhler. *Id.* According to plaintiff, defendant Uhler responded in writing by saying, "'The grievant was interviewed by a security supervisor and was told the cell shield will remain secured for security purposes per deputy superintendent of security.'" *Id.* Even liberally construed, those allegations neither specifically allege nor give rise to an inference that defendant Uhler denied the appeal with deliberate indifference to plaintiff's basic human needs. Instead, defendant Uhler's response reflects that he denied the appeal in light of safety concerns at Upstate. *Id.*

Because the allegations contained within the plaintiff's complaint fail to allege facts plausibly suggesting that plaintiff was either deprived of life's necessities or that defendants acted with deliberate indifference to those necessities, I recommend plaintiff's Eighth Amendment cause of action be dismissed.

15

C.   Plaintiff's Fourteenth Amendment Claim

To establish a procedural due process claim under 42 U.S.C. §

1983, a plaintiff must demonstrate that he (1) possessed an actual liberty

interest, and (2) was deprived of that interest without being afforded

sufficient process. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000);

*Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*,

91 F.3d 349, 351-52 (2d Cir. 1996).

In this case, there are no allegations in the complaint plausibly

alleging that plaintiff was deprived of an actual liberty interest by

defendants' conduct. To the extent that plaintiff alleges that defendants

violated state law by confining him in a shielded cell without first issuing

him a misbehavior report or deprivation order in violation of 7 N.Y.C.R.R. §

305.6, Dkt. No. 1 at 3, it is well settled that violations of state regulations,

standing alone, are not cognizable under section 1983. *See, e.g., Pollnow

v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985); *accord, Old St. George's

LLC v. Bianco*, 389 F. App'x 33, 35 (2d Cir. 2010). In addition, courts in

this circuit have routinely concluded that 7 N.Y.C.R.R. § 305.6 does not

give rise to a protected liberty interest and that prison inmates have no

protected constitutional right in confinement in an unshielded cell. *See,

e.g., Figueroa v. Storm*, No. 07-CV-0018, 2011 WL 1598922, at *6

(W.D.N.Y. Apr. 28, 2011); *Breazil v. Bartlett*, 928 F. Supp. 236, 243

(W.D.N.Y. 1997); *DeMaio*, 877 F. Supp. at 93; *Young v. Scully*, Nos. 91-

CV-4332, 91-CV-4801, 91-CV-6768, 91-CV-6769, 1993 WL 88144, at *3

(S.D.N.Y. Mar. 22, 1993) ("The failure of [7 N.Y.C.R.R. § 305.6] to provide

mandatory language or criteria defeats [the plaintiff]'s claim that the

regulation creates a liberty interest."). Because plaintiff's complaint does

not plausibly allege that he was deprived of a protected liberty interest, I

recommend that his Fourteenth Amendment due process claim be

dismissed.

   D.   <u>Whether to Permit Amendment</u>[7]

      Ordinarily, a court should not dismiss a complaint filed by a *pro se*

litigant without granting leave to amend at least once "when a liberal

reading of the complaint gives any indication that a valid claim might be

stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991); *see also*

Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so

requires."); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F. Supp.

986, 1003 (E.D.N.Y.1995) (permitting leave to replead where court could

---

[7]      In light of my recommendations that plaintiff's Eighth and Fourteenth
Amendment claims be dismissed on other grounds, I have not addressed defendants'
personal involvement arguments set forth in their memorandum of law in support of
their motion.

"not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). Here, given the procedural history of this action, the court must determine whether plaintiff is entitled to the benefit of this general rule.

Because the deficiencies identified above with respect to plaintiff's complaint regarding plaintiff's Eighth Amendment claim could possibly be cured with better pleading, I recommend he be permitted to amend, if desired. Turning to plaintiff's Fourteenth Amendment claim, however, because, as a matter of law, plaintiff does not have a protected liberty interest to an unshielded cell, any amendment plaintiff may offer in a revised pleading would be futile. Accordingly, I do not recommend the court allow any amendment with respect to that claim.

In the event plaintiff chooses to file an amended complaint to cure the deficiencies identified above concerning his Eighth Amendment claim, he is advised that the law in this circuit clearly provides that "'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.'" *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *Pourzandvakil v. Humphry*,

No. 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in his amended complaint, plaintiff must clearly set forth the facts that give rise to the claim, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of each of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, plaintiff is informed that any such amended complaint will replace the existing amended complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ('It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (quotation marks omitted)).

IV.   SUMMARY AND RECOMMENDATION

Plaintiff's complaint asserts claims arising out of both the Eighth and Fourteenth Amendments. Both causes of action, as currently pleaded, fail to state a claim under Rule 12(b)(6). It is possible, however, that, with

better pleading, plaintiff may be able to state a cognizable Eighth Amendment conditions of confinement claim. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 19) be GRANTED and that plaintiff's complaint be dismissed, with leave to amend only with respect to plaintiff's Eighth Amendment cause of action.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[8] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

---

[8]     If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

DATED:    July 26, 2017
          Syracuse, New York

Westlaw.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. *See* Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

> FN1. This matter was referred to the undersigned
> pursuant to 28 U.S.C. § 636(b) and
> N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware that* there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 9:16-cv-00793-BKS-DEP    Document 24    Filed 07/26/17    Page 27 of 81
Scott v. DelSignore, Not Reported in F.Supp.2d (2005)
2005 WL 425473

2005 WL 425473
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Randolph R. SCOTT, Sr., Plaintiff,
v.
Anglelo A. DELSIGNORE, Chief Ct. Clerk,
Thomas A. Beilein, Sheriff & Medical Dept. of Jail,
Niag. Co. Jail, Claude Jeorge, County Attorney,
and Tim Blackley, Deputy Sheriff, Defendants.

No. 02-CV-029F.
|
Feb. 18, 2005.

**Attorneys and Law Firms**

Randolph R. Scott, Sr., USP Allenwood, White Deer,
Pennsylvania, pro se.

Webster Szanyi, LLP, Charles E. Graney, Buffalo, New
York, for Defendant Beilein, of counsel.

DECISION and ORDER

FOSCHIO, Magistrate J.

*JURISDICTION*

**\*1** The parties to this action consented to proceed
before the undersigned on May 31, 2002. The matter
is presently before the court on Plaintiff's motion for
summary judgment (Doc. No. 63), filed on February
20, 2004, Plaintiff's supplemental motion for summary
judgment (Doc. No. 64), filed on February 27, 2004, and
Defendant Beilein's crossmotion for summary judgment
(Doc. No. 72), filed on April 16, 2004.

*BACKGROUND*

Plaintiff, Randolph R. Scott, Sr., proceeding *pro se,*
commenced this civil rights action pursuant to 42 U.S.C.
§ 1983 on January 11, 2002, alleging Defendants, Niagara
County Court Chief Clerk Anglelo A. DelSignore,
Niagara County Sheriff Thomas A. Beilein, Niagara

County Attorney Claude Jeorg, [1] and Niagara County
Sheriff Deputies Tim Blackley and Sergeant Stickney
(collectively referred to as "Defendants"), violated
Plaintiff's constitutional rights under the Fourth, Fifth,
Sixth, Eighth, Thirteenth and Fourteenth Amendments by
denying Plaintiff access to his asthma medication while
in custody. Pursuant to a Decision and Order by District
Judge David G. Larimer, filed on February 12, 2002 (Doc.
No. 5) ("February 12, 2002 Decision and Order"), all
claims were dismissed as against all Defendants except
for the Eighth Amendment deliberate indifference claim
which was permitted to proceed as against Defendant
Sheriff Beilein.

On February 20, 2004, Plaintiff filed a motion for
summary judgment seeking summary judgment on
Plaintiff's deliberate indifference claim. A Memorandum
of Law in support is attached to the motion (Doc.
No. 63) ("Plaintiff's Memorandum"). On February 27,
2004, Plaintiff filed a supplemental motion for summary
judgment seeking summary judgment on the issue
of whether Plaintiff exhausted available administrative
remedies regarding his deliberate indifference claim.
Plaintiff filed in support of the supplemental motion an
attached Memorandum of Law and exhibits (Doc. No.
64) ("Plaintiff's Supplemental Memorandum"), and an
affidavit (Doc. No. 65) ("Plaintiff's Affidavit").

On April 16, 2004, Defendant filed a crossmotion for
summary judgment (Doc. No. 72), supported by the
attached Declaration of Frank V. Balon, Esq. ("Balon
Declaration"), [2] a Memorandum of Law (Doc. No.
73) ("Defendant's Memorandum"), and a Statement of
facts Pursuant to Federal Rules of Civil Procedure,
Local Rule 56 (Doc. No. 74) ("Defendant's Fact
Statement"). On April 28, 2004, Plaintiff filed in response
to Defendants' crossmotion for summary judgment an
affidavit (Doc. No. 77) ("Plaintiff's Response Affidavit").
On May 13, 2004, Defendants filed in further support
of their crossmotion for summary judgment a Reply
Memorandum of Law (Doc. No. 79) ("Defendants'
Reply Memorandum"). On May 28, 2004, Plaintiff
filed a Response in opposition to Defendants' Reply
Memorandum (Doc. No. 80) ("Plaintiff's Reply"). Oral
argument was deemed unnecessary.

Based on the following, Plaintiff's motion for summary
judgment (Doc. No. 63) and supplement motion for
summary judgment (Doc. No. 64) are DENIED;

Defendants' crossmotion for summary judgment (Doc. No. 72) is GRANTED.

## FACTS [3]

**\*2** On February 8, 2001, Plaintiff, Randolph R. Scott, Sr. ("Scott"), while serving a two-month term of incarceration in Niagara County Jail ("the county jail"), was transported to the Niagara Falls City Jail ("the city jail"), for an overnight stay in order to appear in court the following morning. Scott made several requests for permission to bring his asthma medication with him to the city jail, but the requests were denied because of a county jail policy prohibited county jail inmates from possessing medication. Defendant Niagara County Sheriff Thomas A. Beilein ("Sheriff Beilein") is responsible for county jail policies.

In the evening of February 8, 2001, while held in the city jail, Scott suffered an asthma attack and, as he did not have his medication, Scott had to be taken in an ambulance for emergency treatment at Niagara Falls Memorial Medical Center ("the hospital"), where Scott was treated with an "inhaled bronchodilator", also referred to as an asthma inhaler, to improve his breathing. Scott, who was discharged from the hospital less than an hour after his arrival, had the asthma inhaler with him upon returning to the city jail where Defendant Niagara County Sheriff Deputy Tim Blackley took the asthma inhaler, threw it on the floor and broke it. Scott, who is indigent, was billed for both the ambulance ride and his treatment at the hospital, despite the fact that neither would have been necessary had Scott been permitted to bring his asthma medication with him on the overnight trip to the city jail.

On February 9, 2001, Scott filed an administrative complaint with the county jail regarding the denial of his requests to bring his asthma medication with him to the city jail. According to Scott, about a week after filing the administrative complaint, county jail officers Captain Fictinger and Sergeant Giles interviewed Scott regarding the incident and further investigation was ordered. Two weeks after the interview, Scott wrote Captain Fictinger and Sergeant Giles, inquiring about the investigation. The following week, Scott received a reply advising the matter was still under investigation. After another two weeks passed without any resolution

of or further communication regarding the matter, Scott filed a complaint against Captain Fictinger and county jail administration for failure to timely investigate the matter and requested a grievance form.

County jail grievance coordinator Sergeant Dress responded to the new complaint against Captain Fictinger and county jail administration, and Scott was given a grievance form. Scott submitted the grievance form within a few days of receiving it, but, as Scott was released from the county jail shortly thereafter, Scott did not further pursue the grievance. Scott was later reincarcerated in the county jail and is currently incarcerated, presumably on an unrelated federal conviction, at United States Penitentiary Allenwood ("USP Allenwood") in White Deer, Pennsylvania. [4]

## DISCUSSION

**\*3** Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The court is required to construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 58, 593 (2d Cir.1999) (citing *Anderson, supra,* at 255). The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex, supra,* at 322; *see Anderson, supra,* at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). In assessing a record to determine whether there is genuine issue of material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex, supra,* at 323-24 (1986) (quoting Fed.R.Civ.P. 56). Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case." *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 742 (2d Cir.1998).

Both Scott and Defendants seek summary judgment as to whether Scott exhausted administrative remedies in connection with the grievance filed with the county jail, as well as the merits of Scott's challenge to the county jail policy upon which Defendants relied in denying Scott permission to bring his asthma medication to the city jail. Defendants maintain the Scott has failed to exhaust his administrative remedies and that, in any event, Scott has failed to establish any triable issue of fact which, if decided in Scott's favor, would permit Scott to recover for an Eighth Amendment violation based on the denial of his asthma medication. Scott maintains that he sufficiently exhausted his administrative remedies to the extent possible given his release from the county jail soon after filing his grievance, and that the record establishes a violation of his Eighth Amendment rights.

### 1. *Exhaustion of Administrative Remedies*

**\*4** Defendants, who do not dispute that Scott filed a grievance with the county jail, maintain that they are entitled to summary judgment because Scott has admitted that he did not exhaust his administrative remedies. Defendants' Memorandum at 3; Defendants' Reply Memorandum at 3-4. Scott argues in opposition that he exhausted his administrative as much as possible until he was released from the county jail, including the filing of a complaint and a formal grievance with the county jail administrators and participating in the ensuing investigation. Plaintiff's Supplemental Memorandum at 1; Plaintiff's Affidavit ¶¶ 1, 3-4, 11, 13-15.

The Prison Litigation Reform Act of 1995 ("the PLRA"), 110 Stat. 1321 (1996), codified at 42 U.S.C. § 1997e, provides that

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

This mandatory administrative exhaustion requirement applies to all civil actions with respect to prison conditions and individual instances of prison misconduct. *Webb v. Goord,* 340 F.3d 105, 112 (2d Cir.2003). A "civil action with respect to prison conditions" is defined under the PLRA as

> any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison.

18 U.S.C. § 3626(g)(2)(emphasis added).

Based on the language of the PLRA, Scott's federal civil rights claims, alleging deliberate indifference to his serious medical needs, fall within this definition and, as such, the PLRA's exhaustion requirement applies. *See Richardson v. Goord,* 347 F.3d 431, 433-34 (2d Cir.2003) (remanding to district court for determination as to whether inmate plaintiff exhausted administrative remedies regarding claim that defendants acted with deliberate indifference to plaintiff's serious medical needs in violation of the Eighth Amendment).

Exhaustion of administrative remedies is an affirmative defense, rather than a jurisdictional requirement. *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004). As such, a

defendant must either raise a plaintiff's failure to exhaust as an affirmative defense, or the defense is waived. *Johnson, supra,* at 695. Further, as the failure to exhaust is an affirmative defense, it is the defendant's burden to establish that the plaintiff failed to exhaust and, in certain circumstances, a defendant's own actions may preclude the defendant from asserting failure to exhaust as a defense. *Giano, supra,* at 675. Accordingly, here, it is Defendants' burden to establish that Scott failed to exhaust administrative remedies.

**\*5** Although exhaustion is generally mandatory, in "certain situations," including where administrative remedies are not " 'available' to prisoners seeking redress of their grievances," the plaintiff's failure to exhaust is justified. *Giano, supra,* (citing 42 U.S.C. § 1997e(a)). As such, Defendants, to meet their burden of proof on the asserted failure to exhaust defense, are required to establish that administrative remedies were available, but that Scott failed to exhaust the remedies. In attempting to meet their burden, Defendants rely on the fact that Scott admitted in papers submitted in connection with the instant summary judgment motions that Scott failed to exhaust his administrative remedies because county jail officials interfered with Scott's attempts to pursue such remedies, and further maintain that Scott has submitted no evidence that he ever attempted to pursue any administrative remedies relative to his claims. Defendants' Memorandum at 3 (citing Plaintiff's Affidavit). Defendants also rely in support of summary judgment on the affirmative defense of exhaustion that Scott attributed his failure to administratively exhaust the instant claims to the fact that Scott was released from incarceration at the county jail prior to the resolution of his administrative grievance. Defendants' Reply Memorandum at 3-4 (citing Plaintiff's Affidavit and Plaintiff's Response Affidavit).

Defendants' bald assertion that Scott has failed to present any evidence that he ever attempted to exhaust administrative remedies, Defendants' Memorandum at 3, is, without more, insufficient to satisfy Defendants' burden of proof on their affirmative defense. *See Black v. Coughlin,* 76 F.3d 72, (2d Cir.1996) (holding it is defendant's burden in § 1983 action to prove, either at trial or on summary judgment, affirmative defense of qualified immunity and plaintiff was not required to show absence of such defense). Significantly, Defendants have not submitted anything substantiating their assertion that

Scott may not have filed any complaint or grievance regarding the denial of Scott's request to bring asthma medication with him to the city jail, such as a log showing the absence of any such claim being filed while Scott remained incarcerated at the county jail, or an affidavit from the county jail's Inmate Grievance Program ("IGP") indicating that Scott never filed an administrative claim. *See Henrietta D. v. Bloomberg,* 331 F.3d 261, 278 (2d Cir.2003) (observing that absent statutory language to the contrary, Second Circuit would not hold that Congress intended plaintiff to carry burden of establishing a negative proposition where such would impose an "enormous evidentiary burden" and citing cases including *Wyatt v. Terhune,* 315 F.3d 1108, 1119 (9th Cir.2003) (concluding Congress intended PLRA's administrative exhaustion requirement intended as an affirmative defense because, *inter alia,* prison official defendants have better access to prison records)).

**\*6** Further, an inmate's release from custody prior to the resolution of an administrative grievance has been held to constitute a "special circumstance" in which administrative exhaustion is not required. *See Liner v. Goord,* 115 F.Supp.2d 432, 434 (S.D.N.Y.2000) (holding that where inmate filed grievance with IGP, but was released before appealing unfavorable administrative decision to Central Office Review Committee, administrative remedies were no longer available and, thus, inmate's § 1983 action against defendant prison officials could not be dismissed based on inmate's failure to exhaust). Nevertheless, courts have not excused a former inmate's failure to exhaust where the inmate had ample time to file a grievance and pursue administrative remedies prior to being released from custody. *See Finger v. Superintendent McGinnis,* 2004 WL 1367506, \*5 (S.D.N.Y. June 16, 2004) (observing that upon inmate's release from incarceration, administrative remedies were no longer available, but that inmate was nevertheless not excused from exhausting administrative remedies because inmate had sufficient time to exhaust prior to release nine months later). Additionally, release from incarceration does not always end a plaintiff's obligation to pursue administrative remedies, particularly when the plaintiff is shortly thereafter reincarcerated at the same correctional facility where an earlier administrative grievance was filed. *See Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2004) (holding that administrative grievance procedures were "available" to plaintiff within the meaning of the PLRA's exhaustion requirement

during inmate's three separate periods of incarceration at same correctional facility, even though second and third terms of incarceration were for offenses other than that for which plaintiff was initially confined and during which grievance arose).

In the instant case, Scott maintains that he filed an inmate grievance, but that he was unexpectedly released from the county jail before the grievance was resolved and, after his release, Scott did not further pursue the grievance. Plaintiff's Affidavit ¶¶ 11-15. Significantly, Defendants neither challenge Scott's assertion that he filed an administrative grievance, nor do Defendants argue that Scott should have filed his administrative grievance earlier and that had Scott done so, that there was ample time for the grievance to be resolved prior to Scott's release. Defendants also fail to argue that Scott's reincarceration at the county jail, the term of which is not provided in the record, in combination with Scott's earlier incarceration, provided Scott with ample time to pursue his administrative grievance. Accordingly, Defendants have failed to meet their burden of establishing that Scott failed to sufficiently pursue his administrative remedies regarding the claims presently before the court.

Defendants' motion for summary judgment on the ground that Scott failed to pursue administrative remedies is therefore DENIED.

2. *Eighth Amendment Violation*

**\*7** Scott claims he was denied adequate medical care when, pursuant to a county jail policy, his request to bring his asthma medication with him to the city jail on the night of February 8, 2001, was denied, which resulted in Scott having to be transported to a local hospital for emergency care upon having an asthma attack at the city jail. Petition at 4. Scott seeks summary judgment on this claim on the basis that there is no genuine issue of fact that the challenged county jail policy exists and that such policy was unreasonably applied to Scott, resulting in a "severe deprivation" of his medical needs. Plaintiff's Memorandum at 1. Defendants argue in opposition to Plaintiff's summary judgment motion and in favor of Defendants' summary judgment request that Scott has failed to produce any evidence establishing a triable issue of fact that, as a result of the county jail's policy, the county jail staff was deliberately indifferent to a serious medical need. Defendants' Memorandum at 5-7; Defendants' Reply Memorandum at 4-7

Initially, the court observes that there is no merit to the assertions by both Scott and Defendants that because Scott had yet to be convicted of the criminal charges for which he was transported to the city jail in the evening of February 8, 2001, Scott's claims should be analyzed on the basis of Scott's status as a pretrial detainee under the Fourteenth Amendment. *See* Plaintiff's Memorandum at 1; Balon Declaration ¶ 7. Rather, although the asthma attack Scott suffered during the evening of February 8, 2001, occurred while Scott was being held at the city jail, a fair reading of the Petition establishes that it is the alleged denial of Scott's request for permission to take his asthma medication with him to the city jail that Scott is challenging. Petition at 4. Scott's request allegedly was denied by county jail officials pursuant to a county jail policy, the enforcement of which allegedly is Defendant Sheriff Beilein's responsibility. *Id.* As such, Scott's claim for denial of adequate medical care is properly analyzed as a violation of the Eighth Amendment's proscription against cruel and unusual punishment .[5]

It is well settled that the Eighth Amendment prohibits "cruel and unusual" punishment suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97 (1976). Under the Eighth Amendment, prison officials are required to provide humane conditions of confinement, ensuring that inmates receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle, supra,* at 104 (bracketed text in original)). A serious medical condition exists where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Chance, supra,* at 702. Further, the standard for determining whether there has been an Eighth Amendment violation based on deliberate indifference to a prisoner's serious medical needs

> **\*8** incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind.

*Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (citing *Estelle, supra,* at 104, and *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)).

Denying or delaying access to medical care or intentionally interfering with prescribed treatment may constitute deliberate indifference. *Estelle, supra,* at 104; *see Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding dentist's outright refusal for one year to treat a cavity, a degenerative condition that tends to cause acute infection and pain if left untreated, combined with imposition of an unreasonable condition on such treatment, could constitute deliberate indifference on the part of prison dentist, precluding summary judgment in defendant's favor). Such treatment violates the Eighth Amendment "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards by intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. *Estelle, supra,* at 104-105. Further, culpable intent requires the inmate to establish both that a prison official "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes v. New York City Department of Corrections,* 84 F.3d 614, 620 (2d Cir.1996) (citing *Farmer, supra,* at 834-35).

In the instant case, Defendants assert in support of summary judgment that the denial of Scott's request to bring his asthma medication with him from the county jail to the city jail where Scott was to be housed overnight on February 8, 2001, did not amount to deliberate indifference to a serious medical need because Scott's asthma is not a condition that may produce death, degeneration or extreme pain." Defendants' Memorandum at 5. In support of this argument, Defendants rely on the fact that the asthma attack that Scott suffered on February 8, 2001, was, "at worst, a very mild asthma exacerbation." *Id.* In further support, Defendants submit the affidavit of Robert Rattner, M.D. ("Dr. Rattner Affidavit"), [6] who explains that the medical records of the treatment Scott received at the hospital are "consistent with the standard of care for a patient experiencing a mild asthmatic exacerbation which consisted of taking five puffs with an asthma inhaler." Dr. Rattner Affidavit ¶¶ 5, 13. Dr. Rattner continues that

Scott was discharged from the hospital's emergency room "within an hour of his arrival," that Scott never exhibited signs of diminished blood oxygen levels, and that a patient having more than a mild exacerbation of asthma would have a number of other findings upon examination, which Scott did not exhibit. Dr. Rattner Affidavit ¶¶ 6-12. Defendants thus maintain they are entitled to summary judgment because Scott has failed to point to any issue of fact that his asthma attack was serious enough to satisfy the objective prong of the deliberate indifference standard. Defendants' Memorandum at 5-6; Defendants' Reply Memorandum at 5. Defendants also argue they are entitled to summary judgment because Scott has failed to demonstrate a triable issue of fact that as a result of county jail policy, any county jail official was deliberately indifferent to Scott's serious medical needs. Defendants' Memorandum at 5-6; Defendants' Reply Memorandum at 6-7.

**\*9** The court first considers the objective prong of the standard for determining whether Scott's Eighth Amendment rights were violated by Defendants' deliberate indifference to his serious medical needs. A sufficiently serious condition is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway, supra,* at 66. The mere fact that an inmate has an asthmatic condition does not necessarily mean that the inmate has a serious medical need, although an actual asthma attack, depending on the severity, may be a serious medical condition. *See Patterson v. Lilley,* 2003 WL 21507345, *3-4 (S.D.N.Y. June 30, 2003) (denial of asthma medication to asthmatic who alleged no discomfort or symptoms of an emergent attack does not satisfy objective component of deliberate indifference claim). Rather, the existence of the condition must be distinguished from a situation in which an inmate is actually experiencing an asthma attack. *Patterson, supra* (comparing and contrasting *Ennis v. Davies,* 1990 WL 121527 (S.D.N.Y. Aug. 15, 1990 (denying defendants' motion for summary judgment based on prison official's refusal to provide inmate with his asthma medication during an actual asthma attack), with *Sulkowska v. City of New York,* 129 F.Supp.2d 274 (S.D.N.Y.2001) (defendant's denial of pretrial detainee's asthma medication, in the absence of an asthma attack, amounted to nothing more than mere negligence and did not satisfy objective prong of deliberate indifference test)). Similarly, in *Patterson, supra,* an inmate with an asthmatic condition, was denied access to his daily

asthma medication upon arriving at a correctional facility, and was informed that he had to wait until the next morning before he could be screened for his medication. *Patterson, supra,* at *1. The inmate experienced an asthma attack the next morning, for which he received breathing treatment and was given oral medication. *Id.* The inmate later sued the prison officials for an Eighth Amendment violation based on the failure to provide him with his asthma medication, thereby causing the inmate to suffer an asthma attack. *Id.* at *2. The court held that because the inmate was never denied any treatment for an actual asthma attack, the objective prong of the deliberate indifference test was not met. *Id.* at * 4.

Significantly, in the instant case, when Scott's request for permission to bring his asthma medication with him to the city jail was denied, Scott was not then exhibiting any symptoms of an imminent asthma attack. Moreover, when Scott did experience an actual asthma attack while at the city jail, Scott was taken for medical treatment at the emergency room of a local hospital. Scott does not allege that such treatment was unduly delayed, or in any way insufficient to alleviate his symptoms. In contrast, the medical records Defendants submitted in support of summary judgment, the authenticity and accuracy of which Scott does not dispute, establish that Scott's asthma symptoms were alleviated by taking five puffs of a bronchiodilator, and that Scott, upon being discharged within an hour of his arrival at the local hospital, was free of asthma symptoms. Medical Records, Exhibit A to Dr. Rattner Affidavit. Accordingly, the record demonstrates that the objective prong of the deliberate indifference standard has not been met by the denial of Scott's request for permission to bring his asthma medication with him for the overnight stay at the city jail.

**\*10** The record also establishes that the subjective prong of the deliberate indifference test has not been met. Preliminarily, the court observes that Defendants' conduct must be examined only in the context of Scott's medical condition when his request for permission to take his asthma medication with him to the city jail was denied. *Patterson, supra,* at *4 and n. 3. However, the record is devoid of any indication that Scott was on the verge of experiencing an asthma attack either when he requested his medication, or when the request was denied. Moreover, even if Scott was experiencing any symptoms

of an asthma attack prior to being transported to the city jail, nothing in the record establishes, nor does Scott allege, that any Defendant observed such symptoms, yet failed to provide Scott with treatment. As such, the record demonstrates that the subjective prong of the deliberate indifference standard of culpable intent, *i.e.,* that a prison official both knew that Scott was experiencing a severe asthma attack, yet failed to take reasonable measures to abate any harm from the attack, *Hayes, supra,* at 620, also has not been met.

As neither the objective, nor the subjective prong of the deliberate indifference standard for establishing an Eighth Amendment violation based on the denial of adequate medical care for a serious medical need has been met, summary judgment is GRANTED in favor of Defendants and DENIED as to Scott.

*CONCLUSION*

Based on the foregoing, Plaintiff's motion for summary judgment (Doc. No. 63) and supplement motion for summary judgment (Doc. No. 64) are DENIED; Defendants' crossmotion for summary judgment (Doc. No. 72) is GRANTED. The Clerk of the Court is directed to close the file.

Any appeal to the United States Court of Appeals for the Second Circuit, New York, New York, must be filed within thirty (30) days of the date of judgment in this action. *See* Fed.R.App. 4(a)(1). Further, the court certifies under Rule 24(a)(3)(A) of the Federal Rules of Appellate Practice that any appeal by Plaintiff of the foregoing Decision and Order would not be in good faith as the paucity of the record fails to establish a triable issue of fact for any Eighth Amendment claim. As such, requests to proceed on appeal as a poor person must be filed with the United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24(a)(5) of the Federal Rules of Appellate Procedure.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 425473

2005 WL 425473

Footnotes

1    The court uses the correct spelling of Niagara County Attorney Jeorg's name.

2    On April 19, 2004, Defendants filed an exact duplicate of the Balon Declaration (Doc. No. 75), but without the exhibits
     attached to the first filing.

3    Taken from the pleadings and motion papers filed in this action.

4    The record does not indicate when Scott was readmitted to the county jail, how long Scott remained in the county jail
     upon being reincarcerated there, or when Scott was incarcerated at USP Allenwood. However, the absence of such
     information will not prevent a disposition on the merits of the instant motions.

5    Whether the Eighth Amendment or the Fourteenth Amendment applies is largely academic given that the same "deliberate
     indifference to a serious medical need" test is applied to both inmates and pretrial detainees alleging denial of adequate
     medical care. *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000); *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996).

6    Exhibit C to Defendants' Notice of Crossmotion for Summary Judgment.

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:16-cv-00793-BKS-DEP  Document 24  Filed 07/26/17  Page 35 of 81
Patterson v. Lilley, Not Reported in F.Supp.2d (2003)
2003 WL 21507345

2003 WL 21507345
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Bernard PATTERSON, Plaintiff,

v.

Sharon LILLEY, Wladyslaw Sidorowicz, Ginger
Eggler, and William Brown, Defendants.

No. 02 Civ.6056 NRB.
|
June 30, 2003.

Prisoner brought federal civil rights suit against prison intake nurse, prison doctor, and two supervisors, alleging deliberate indifference to his asthmatic condition. Defendants moved to dismiss complaint for failure to state claim. The District Court, Buchwald, J., held that: (1) prisoner's asthma was not sufficiently serious to require care immediately upon his arrival at prison; (2) intake nurse was not deliberately indifferent to prisoner's medical needs; (3) prisoner's preference for treatment by particular doctor and his disagreements concerning method of treatment did not show deliberate indifference to his medical needs; (4) prison doctor's alleged remark about effect of budgetary constraints on treatment did not give rise to claim under facts; and (5) supervisors were not liable for alleged Eighth Amendment violations.

Motion granted.

West Headnotes (7)

[1]     **Prisons**
        Particular Conditions and Treatments
        **Sentencing and Punishment**
        Medical care and treatment

Prisoner's asthmatic condition was not sufficiently serious to give rise to Eighth Amendment violation when intake nurse informed prisoner at midnight that he would have to wait to following morning to receive medication; prisoner did not allege any discomfort at time or experience any symptoms of emergent attack. U.S.C.A. Const.Amend. 8.

12 Cases that cite this headnote

[2]     **Prisons**
        Particular Conditions and Treatments
        **Sentencing and Punishment**
        Medical care and treatment

Prison nurse was not deliberately indifferent to prisoner's serious medical needs in violation of Eighth Amendment when she informed him, during intake to prison, that he would have to wait until morning to be evaluated for asthma medications; nothing suggested that nurse acted with requisite mental state of criminal recklessness, where prisoner was not experiencing discomfort at time or any symptoms of emergent attack. U.S.C.A. Const.Amend. 8.

9 Cases that cite this headnote

[3]     **Prisons**
        Particular Conditions and Treatments
        **Sentencing and Punishment**
        Medical care and treatment

Prisoner's preference for examination by particular physician did not prove deliberate indifference to his serious medical needs, in violation of Eighth Amendment, where he did receive medical treatment between his arrival at facility and examination by physician of choice. U.S.C.A. Const.Amend. 8.

6 Cases that cite this headnote

[4]     **Prisons**
        Particular Conditions and Treatments
        **Sentencing and Punishment**
        Medical care and treatment

Prisoner's disagreements with method in which his asthma was treated, including lowering medication dosage, changing medications, and for some period, taking him entirely off medication, involved mere difference of opinion, rather than deliberate

indifference to his serious medical needs and thus could not violate Eighth Amendment. U.S.C.A. Const.Amend. 8.

6 Cases that cite this headnote

**[5]    Sentencing and Punishment**
&#x1F511; Medical care and treatment

Any alleged negligence on part of prison physician in treating prisoner did not rise to level of Eighth Amendment violation merely because patient was prisoner. U.S.C.A. Const.Amend. 8.

1 Cases that cite this headnote

**[6]    Prisons**
&#x1F511; Particular Conditions and Treatments

**Prisons**
&#x1F511; Health and medical care

**Sentencing and Punishment**
&#x1F511; Medical care and treatment

Prison physician's alleged remark concerning possible effect of budgetary constraints on treatment for prisoner's asthma was insufficient to create Eighth Amendment violation; there was no withholding of treatment contemporaneous to remark, and prisoner did not suffer any attacks as result of later elimination of asthma medications. U.S.C.A. Const.Amend. 8.

1 Cases that cite this headnote

**[7]    Civil Rights**
&#x1F511; Criminal law enforcement;prisons

**Prisons**
&#x1F511; Particular Conditions and Treatments

**Sentencing and Punishment**
&#x1F511; Medical care and treatment

Alleged failure of nurse administrator and another prison supervisor to act on prisoner's information about alleged indifference to his medical needs did not violate Eighth Amendment; supervisors were not personally involved in prisoner's medical treatment, no unconstitutional custom or practice was

implicated, supervisory officials were not grossly negligent, and there was no underlying violation by medical personnel. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

**Attorneys and Law Firms**

Mr. Bernard Patterson, Green Haven Correctional Facility, Stormville, New York, for Plaintiff.

Kimberly A. Dasse, Assistant Attorney General, New York, New York, for Defendant.

MEMORANDUM AND ORDER

BUCHWALD, J.

**\*1** Plaintiff Bernard Patterson ("plaintiff"), currently incarcerated in Central New York Psychiatric Center's satellite unit at Green Haven Correctional Facility, brings this action *pro se* against the following health care workers and staff members of Sullivan Correctional Facility, where plaintiff was formerly imprisoned: Nurse Ginger Eggler; Dr. Wladyslaw Sidorowicz; Nurse Administrator Sharon Lilley; and Deputy of Administrative Services William Brown (collectively, "defendants"). Plaintiff brings suit under 42 U.S.C. § 1983, alleging that defendants violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution by their deliberate indifference to his medical care. Defendants have moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted and pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction due to a failure to exhaust administrative remedies required by the Prison Litigation Reform Act. 42 U.S.C. § 1197e(a). For the reasons that follow, the defendants' motion to dismiss for failure to state a claim is granted. [1]

*BACKGROUND* [2]

Plaintiff alleges that on December 19, 2001, at approximately twelve o'clock midnight, he arrived at

Sullivan Correctional Facility ("Sullivan"). Upon arrival, he advised the processing officer that he was an asthmatic and had not received his medication for that day. The processing officer notified the nurse of plaintiff's condition. Shortly thereafter, the processing officer returned and informed plaintiff that Nurse Ginger Eggler said plaintiff would have to wait until morning to be seen by anyone. Plaintiff was then escorted to a housing unit without being screened for medical or mental disorders and without receiving any asthma medication.

The following morning, December 20, 2001, at approximately 8:20 a .m., plaintiff maintains he suffered an asthma attack. Plaintiff was examined at the facility clinic, given breathing treatment, and provided oral medication. He was advised he would be called to the clinic to pick up his asthma medication that evening, but was never called. The following morning, plaintiff reported to the facility clinic to inquire why he had not been called to pick up his medication. Plaintiff avers he was informed that the doctor had lowered the dosage of his medication. Plaintiff inquired as to why his dosage had been lowered without a personal consultation by a doctor. Plaintiff does not state what the response was to this inquiry.

Plaintiff claims that because the dosage had been lowered, and because he was never evaluated properly, he suffered five additional asthma attacks on January 6, 9, 11, 13, and 14, 2002. However, plaintiff does not allege that he sought treatment at the infirmary for any of the attacks in January. Nonetheless, on January 14, 2002, plaintiff was examined by Dr. Wladyslaw Sidorowicz. During this examination, Dr. Sidorowicz put plaintiff on a different medication and further advised plaintiff to let him know if the new medication did not work and he would change it. Plaintiff also alleges that during this same examination, Dr. Sidorowicz told him that he intended to stop plaintiff's asthma medication in an effort to keep the budget down.

*2  On February 21, 2002, plaintiff alleges that he was placed in the infirmary as a result of inadequate medical treatment for his asthma, but he does not describe the reasons for his admission to the infirmary, the treatment he received, or when he was discharged. Plaintiff claims that on March 8, 2002, he informed a nurse that the new medication was not working and requested to be placed back on his original asthma medication. Several days later, on March 11, plaintiff maintains he reported to sick call and was told by a nurse that she had, in fact, spoken

with Dr. Sidorowicz about his asthma medication, and that the doctor had decided to discontinue the medication because it was not working and chose not to prescribe anything in its place. Plaintiff suffered no additional asthma attacks.

Although the precise timing is unclear, plaintiff claims he wrote a letter to Nurse Administrator ("N.A.") Sharon Lilley explaining his unhappiness with the treatment he was receiving for his asthma. In her response letter, plaintiff claims N.A. Lilley justified Nurse Eggler's screening upon his initial intake at Sullivan and Dr. Sidorowicz's decision to discontinue his medication. Plaintiff also claims he wrote a letter to Deputy of Administrative Services William Brown. Plaintiff does not describe the contents of his own letter, only that Deputy Brown advised plaintiff that his medication had been changed to a better regime with more effective medication. Plaintiff further avers that in a later letter from Deputy Brown, he was advised that "testing at this facility does not support your self diagnosis of asthma."

Plaintiff claims that as a result of the mental duress caused by this situation, he chose to cut his right forearm with a shaving razor on March 25, 2002. Plaintiff further avers that Dr. Sidorowicz initially refused to send him to an outside hospital to treat the wound, but that after being pressured by the mental health staff, the doctor sent him to an outside medical center where he received twenty stitches. Thereafter, on April 3, 2002, Dr. Sidorowicz placed plaintiff back on his original asthma medication.

Plaintiff herein has four complaints: (1) Nurse Eggler denied plaintiff his asthma medication upon his initial intake at Sullivan and did not properly screen him, such that if he were properly screened, he would not have been given a shaving razor due to his mental disorder; (2) Dr. Sidorowicz did not properly treat and failed to examine him earlier than January 14, 2002, and that prior thereto, plaintiff suffered six asthma attacks; (3) N.A. Lilley failed to act on the content of the plaintiff's complaint letter; and (4) Deputy Brown, a non-medical professional, should not have given a medical opinion in response to plaintiff's complaint letter, and failed to remedy the inadequate medical care of which plaintiff complained.

Plaintiff filed suit on August 23, 2002. He moved to have counsel assigned, which we denied on October 10, 2002. Defendants moved to dismiss on November 22, 2002.

*DISCUSSION*

I. Motion to Dismiss Standard

**\*3** A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) tests the legal sufficiency of a complaint and should be granted "only if it is clear that no relief could be granted under any set of facts consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In this context, our function is "merely to assess the legal feasibility of the complaint, not to assay the legal feasibility of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). We acknowledge, towards this end, the well-settled principle that the movant bears the burden of persuasion and that the nonmovant's well-pleaded factual allegations must be accepted as true. *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). Moreover, a complaint submitted *pro se* must be liberally construed and is held to a less rigorous standard of review than formal pleadings drafted by an attorney. *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980); *Salahuddin v. Coughlin,* 781 F.2d 24, 28 (2d Cir.1986).

II. Eighth Amendment Standard

In an action brought under 42 U.S.C. § 1983, the plaintiff must establish that a person acting under color of state law deprived him of a federal constitutional right. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Here, plaintiff claims that defendants Nurse Eggler and Dr. Sidorowicz violated his Eighth Amendment rights by failing to provide him with proper medical care, and that defendants N.A. Lilley and Deputy Brown violated his Eighth Amendment rights by failing to properly address his complaints regarding such inadequate care.

The Eighth Amendment, made applicable to the states by the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishment." *See Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (holding that the Eighth Amendment is applicable to treatment and conditions of confinement for prison inmates). We are additionally mindful of the state's constitutional obligation to provide inmates with adequate medical care. *See Id.* at 832. Indeed, it is well-

established that a prison official's denial of access to medical care or interference with prescribed treatment may constitute the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977). To state a cognizable claim under § 1983 for inadequate medical care, an inmate must allege acts or omissions sufficiently harmful to evidence "deliberate indifference" to his serious medical needs. *Estelle,* 429 U.S. at 104. As such, the plaintiff must allege conduct that is "an unnecessary and wanton infliction of pain," or that is "repugnant to the conscience of mankind." *Id.* at 105–06.

The deliberate indifference standard "embodies both an objective and subjective prong" and the plaintiff must satisfy both prongs in order to establish that prison officials unconstitutionally deprived him of adequate medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied, sub nom. Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). First, the inmate's medical condition must be, in objective terms, "sufficiently serious." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A condition is "sufficiently serious" under the Eighth Amendment if it is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway,* 37 F.3d at 66 (citing *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting). Second, the charged official must act with a sufficiently culpable state of mind. *See Wilson,* 501 U.S. at 298. "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66 (citing *Farmer,* 511 U.S. at 835–36). More specifically, a prison official does not act in a deliberately indifferent manner unless that official "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

III. Evaluation of Plaintiff's Claims

**\*4** Having set forth the two-part standard for deliberate indifference, we now consider whether plaintiff's allegations satisfy both the objective and subjective prongs with regard to each individual defendant.

A. Nurse Eggler

Case 9:16-cv-00793-BKS-DEP    Document 24    Filed 07/26/17    Page 39 of 81
Patterson v. Lilley, Not Reported in F.Supp.2d (2003)
2003 WL 21507345

**[1]** Plaintiff claims that upon his intake at Sullivan he was denied his asthma medication by Nurse Eggler and was not properly screened for mental disorders. Assuming the truth of these allegations and viewed in the light most favorable to the plaintiff, they do not amount to a constitutional deprivation as they meet neither the objective nor subjective elements of the deliberate indifference standard.

At the time of Nurse Eggler's involvement, around midnight on December 19, 2001, she was informed only that plaintiff was an asthmatic and that he desired his medication. Plaintiff did not allege any discomfort or any symptoms of an emergent attack. Thus, plaintiff does not satisfy the objective component of a deliberate indifference claim. More than minor discomfort or injury is required for plaintiff to meet the objective prong of demonstrating a "sufficiently serious" medical need.

Being an asthmatic (a person susceptible to asthma attacks) is not a condition, in Eighth Amendment parlance, that is severe or "sufficiently serious." The existence of the condition is distinct from the situation in which an inmate is suffering an actual attack. *Cf. Ennis v. Davies,* No. 87 Civ. 1465, 1990 WL 121527 (S.D.N.Y. Aug.15, 1990) (denying a motion for summary judgment based on prison official's refusal to provide an inmate his asthma medication during an actual attack). Indeed, in *Sulkowska v. City of New York,* 129 F.Supp.2d 274 (S.D.N.Y.2001), where plaintiff was denied her asthma medication while a detainee in police custody, the court found that such conduct amounted to no more than mere negligence, not deliberate medical indifference, as asthma was not sufficiently serious to warrant Eighth Amendment protection in the absence of an attack or symptoms of an attack. [3] *Id.* at 292.

**[2]** Plaintiff's allegations concerning Nurse Eggler also fail to meet the subjective prong of the indifference claim. Plaintiff does not provide facts sufficient to find that Nurse Eggler acted with the requisite mental state of criminal recklessness. *See Hennings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). As noted, plaintiff never complained to Nurse Eggler of any pain, discomfort, or any condition that was "fast-degenerating" or "life-threatening." Nurse Eggler did not refuse to treat plaintiff altogether, but merely informed plaintiff when he arrived at midnight that he would have to wait until morning to be evaluated. Assuming that these allegations amount to

negligent treatment, they are insufficient to state a claim for deliberate indifference, and plaintiff has not alleged any denial of care in the face of needed medical attention that would suggest a higher level of culpability. *See Estelle,* 429 U.S. at 106 (holding that a negligent diagnosis is not enough to meet the subjective test). Plaintiff's perspective that something more should have been done in light of his medical condition is not sufficient basis for a deliberate indifference claim. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998).

**\*5** Accordingly, as plaintiff has failed to plead that Nurse Eggler was deliberately indifferent to a serious medical need of his, he has failed to state a claim against her for which relief may granted.

### B. Dr. Sidorowicz

**[3]** Plaintiff makes a variety of claims against Dr. Sidorowicz. First, plaintiff contends that Dr. Sidorowicz did not personally examine him until January 14. However, even plaintiff's own complaint establishes that he did receive medical treatment between his arrival at the facility and his examination by Dr. Sidorowicz, and moreover, that a doctor was involved in that period of treatment. The record is unclear as to whether it was Dr. Sidorowicz or another physician who was involved in plaintiff's treatment before January 14. Indeed, plaintiff does not allege that any serious medical event between his arrival and January 14 (the date of his last alleged attacked) was knowingly untreated by health officials. Furthermore, on January 14, Dr. Sidorowicz did treat plaintiff. The Eighth Amendment requires that there not be deliberate indifference to a prisoner's serious medical needs, but not that a prisoner receive unfettered access to the medical care of his choice. *Alston v. Howard,* 925 F.Supp. 1034 (S.D.N.Y.1996). "Plaintiff's preference for an examination by a physician does not sustain a claim for denial of medical assistance. 'There is no right to the medical treatment of one's choice if the prescribed treatment is based upon applicable medical standards." ' *Reyes v. Turner,* No. 93 Civ. 8951, 1996 WL 93728, at *2 (S.D.N.Y. Mar.5, 1996) (quoting *McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988).

**[4]** Plaintiff also raises issues relating to the treatment of his asthma that involved changing his medication, lowering the dosage, and for some period, taking him off of his medication entirely. These complaints are properly characterized as a difference of opinion

Patterson v. Lilley, Not Reported in F.Supp.2d (2003)
Case 9:16-cv-00793-BKS-DEP    Document 24    Filed 07/26/17    Page 40 of 81
2003 WL 21507345

—plaintiff's desired treatment versus Dr. Sidorowicz's medical judgment—rather than deliberate indifference. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 703; *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). In fact, "so long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.* The government must provide medical care for its prisoners, *Estelle,* 429 U.S. at 103, but "the prisoner's right to medical care—not to the type or scope of medical care which he personally desires." *Linden v. Westchester County,* No. 93 Civ. 8373, 1995 WL 686742, at *3 (S.D.N.Y. Nov.20, 1995) (quoting *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864, 867 (2d Cir.1970)). In fact, plaintiff's allegations, rather than reflecting indifference, reflect attention and include Dr. Sidorowicz's telling statement to plaintiff to let the doctor know if the medication was not effective so it could be changed.

*\*6* **[5]**    At worst, plaintiff's allegations against Dr. Sidorowicz amount to negligence or medical malpractice. Even if we assume those conclusions *arguendo,* plaintiff's claim must still fail because a "complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle,* 429 U.S. at 105–06; *Hathaway,* 99 F.3d at 553; *Farmer,* 511 U.S. at 837; *see also Vento v. Lord,* No. 96 Civ. 6169, 1997 WL 431140, at *4 (S.D.N.Y. July 31, 1997) ("[D]isagreement with the defendants' diagnoses and dissatisfaction with the treatment of her medical condition [are] allegations which are not actionable under the Eighth Amendment."). Further, allegations of negligence, medical malpractice, or errors in professional judgment are insufficient to sustain an Eighth Amendment claim. *See Zimmerman v. Macomber,* No. 95 Civ. 0882, 2001 WL 946333 (S.D.N.Y. Aug.21, 2001); *see also Gill v. Mooney,* 824 F.2d 192 (2d Cir.1987). It is also clear that medical malpractice does not become a constitutional violation merely because the victim is a prisoner. *Estelle,* 429 U.S. at 106.

**[6]**    Finally, we comment on one particular aspect of plaintiff's allegations, namely, the remark attributed to Dr. Sidorowicz concerning the possible effect of budgetary constraints on plaintiff's treatment. First, based on plaintiff's own allegations, there was no withholding of treatment contemporaneous to the alleged remark. Second, even when plaintiff was taken off his asthma medication weeks later, he did not suffer any attacks. Furthermore, it should be noted that consideration of cost factors in choosing a course of treatment of a prisoner is, in and of itself, no more violative of a prisoner's constitutional rights than is, for example, the consideration of the cost of providing prescription drug coverage to non-incarcerated recipients of Medicare.

### C. N.A. Lilley and Deputy Brown

**[7]**    Plaintiff asserts that he wrote letters complaining about his medical treatment to both N.A. Lilley and Deputy Brown. Plaintiff claims that N.A. Lilley failed to properly address the problems outlined in his complaint letter to her and that Deputy Brown improperly offered a medical opinion in his response to plaintiff's complaint letter to him. Plaintiff asserts N.A. Lilley wrote a response to him in support of the course of treatment plaintiff was receiving from Dr. Sidorowicz and the behavior of Nurse Eggler. In Deputy Brown's alleged response to plaintiff, he justified the medical regime implemented by Dr. Sidorowicz. Neither defendant, based on these facts alleged in plaintiff's complaint, can be said to have violated plaintiff's constitutional rights in any manner.

It is well-established that liability for damages under § 1983 may not be based on the *respondeat superior* or vicarious liability doctrines. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Koehl v. Dalsheim,* No. 94 Civ. 3351, 1995 WL 331905, at *2 (S.D.N.Y. June 5, 1995). The mere fact that a defendant occupies a position of authority will not merit the imposition of § 1983 liability. *See Al Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). A supervisor is not liable for civil rights violations committed by his subordinates;[4] to recover damages in a § 1983 claim, a plaintiff must demonstrate that the defendants were personally involved in the alleged wrongdoing. *Id; McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977) (holding that defendants' personal involvement is a prerequisite to recovery of damages under § 1983, since the doctrine of *respondeat superior* does not apply), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Personal involvement of a supervisory official within the meaning of § 1983 may be established through: (1) direct participation in a constitutional wrong; (2) failure to remedy a known wrong; (3) creation of

2003 WL 21507345

an unconstitutional practice or custom; or (4) gross negligence in managing subordinates who have caused the violation. *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986); *Candeleria v. Coughlin,* 787 F.Supp. 368, 372 (S.D.N.Y.), *aff'd,* 979 F.2d 845 (2d Cir.1992). Plaintiff's complaint fails to meet any of the four circumstances recognized.

**\*7** Plaintiff does not present any facts to suggest that the supervisory defendants were personally responsible for the alleged denial of medical care or in the alleged deprivation of plaintiff's rights. No unconstitutional practice or custom was created nor were the supervisory defendants grossly negligent in managing their subordinates. Moreover, as we find no underlying constitutional violations were committed by Nurse Eggler or Dr. Sidorowicz, N.A. Lilley's and Deputy Brown's alleged failure to act on information concerning such alleged violations does not support liability under § 1983. [5]

CONCLUSION

A *pro se* complaint can only be dismissed for failure to state a claim if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–6, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Even applying these liberal standards, plaintiff's claims against each of the defendants is not cognizable under § 1983. Accordingly, we conclude that plaintiff's allegations of deliberate indifference to his medical needs fail to state a claim upon which relief can be granted. Defendants' motion to dismiss is granted.

Pursuant to 28 U.S.C. § 1915(a)(3), it is hereby certified that any appeal from this order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). The Clerk of the Court is hereby instructed to close this case on the Court's docket.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 21507345

Footnotes

1   While the parties dispute whether the plaintiff has exhausted all of his claims, the defendants concede that he exhausted at least some of his administrative remedies, and as we dismiss the complaint on the merits, we need not resolve the exhaustion issue.

2   Unless otherwise noted, all facts are taken from plaintiff's complaint.

3   In contrast to the response at the time of plaintiff's midnight arrival, he received medical care the next morning when he had an attack. Nurse Eggler's conduct should be examined only in the context of plaintiff's condition at the time of his arrival at the facility. Nurse Eggler could only be held deliberately indifferent to an existing, serious medical condition, not a speculative, future medical injury. The requisite culpable state of mind would necessarily be absent for the unknown, future injury. Plaintiff's allegation that he cut his arm three months after arriving at Sullivan because he was not initially screened for mental disorders by Nurse Eggler (without making any indication or notification of such a disorder) also fails for this reason.

4   We are assuming only for purposes of this decision that the relationship of supervisor/subordinate exists between the relevant actors.

5   Defendants argue additionally that they are not individually liable under § 1983 because they are entitled to qualified immunity. Because we dismiss plaintiff's claims on the merits, it is unnecessary to address this issue.

2011 WL 1598922
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

William FIGUEROA, Plaintiff,
v.
Correctional Officer P. STORM, Correctional
Officer Boczar, Correctional Hearing Officer
Kearney, Correctional Hearing Officer Schoellopf,
and Correctional Sergeant Sindoni, Defendants.

No. 07–CV–18S.
|
April 28, 2011.

**Attorneys and Law Firms**

William Figueroa, Fallsburg, NY, pro se.

Michael J. Russo, New York State Attorney General's
Office, Buffalo, NY, for Defendants.

### DECISION AND ORDER

WILLIAM M. SKRETNY, Chief Judge.

### I. INTRODUCTION

*1  In this action, pro se Plaintiff William Figueroa
alleges, pursuant to 42 U.S.C. § 1983, that Defendants
violated his Fourteenth Amendment due process rights
and Eighth Amendment rights to be free from excessive
force while he was an inmate in the custody of the
New York State Department of Correctional Services
("DOCS"). Presently before this Court is Defendants'
Motion for Summary Judgment. [1] Despite being warned
about the consequences of his failure to do so, Plaintiff has
not responded to Defendants' motion. For the following
reasons, Defendants' motion is granted in its entirety.

### II. BACKGROUND

Because Plaintiff failed to respond to Defendants' motion,
all facts set forth in Defendants' Rule 56 Statement are

deemed admitted. See Fed.R.Civ.P. 56(e)(2); Local Rule
56(a)(2).

**A. May 6, 2005 Incident and Subsequent Disciplinary
Hearing**
Plaintiff is a deaf inmate who was housed at the Wende
Correctional Facility during the time period relevant to
the Complaint.

On May 6, 2005, Plaintiff threw a bucket of urine and feces
on a prison staff member. (Defendants' Rule 56 Statement
of Undisputed Facts ("Defendants' Statement"), ¶ 9.)
This resulted in the issuance of a pre-hearing restricted-
diet order for May 6–12, 2005, and a cell-shield order,
which was repeatedly renewed through June 7, 2005.
(Defendants' Statement, ¶ 12.)

On May 17, 2005, Defendant Schoellkopf conducted a
Tier III disciplinary hearing regarding two Misbehavior
Reports that arose out of this incident. (Defendants'
Statement, ¶ 1.) Before the hearing, a sign language
interpreter assisted Plaintiff to ensure that he understood
the charges against him, could interview potential
witnesses, and could obtain relevant documents.
(Defendants' Statement, ¶ 1.) Plaintiff completed a form
attesting that the interpreter meaningfully assisted him.
(Defendants' Statement, ¶ 1.)

Defendant Schoellkopf began the hearing by advising
Plaintiff of his rights, and Plaintiff acknowledged
through the interpreter that he understood. (Defendants'
Statement, ¶ 2.) Plaintiff complained that he could
not effectively sign while handcuffed, but in response
to Defendant Schoellkopf's inquiry, the interpreter
confirmed that she could understand Plaintiff's signs.
(Defendants' Statement, ¶ 2.) At some point during the
hearing, Plaintiff became agitated and pulled down his
pants, exposing himself to Defendant Schoellkopf and the
female interpreter. (Defendants' Statement, ¶ 2.) Plaintiff
was therefore removed from the hearing. (Defendants'
Statement, ¶ 2.)

**B. May 16, 2005 Incident and Subsequent Disciplinary
Hearing**
On May 16, 2005—one day before the hearing described
above—Plaintiff was housed in the Special Housing Unit
("SHU"). (Defendants' Statement, ¶ 3.) After receiving
a restricted diet meal, Plaintiff refused to return his

tray, cup, and spork, despite Defendant Boczar's directive to do so. (Defendants' Statement, ¶¶ 3, 11.) Plaintiff ignored several more orders to surrender his utensils, and instead held the cup and threatened to throw its unknown liquid contents on staff. (Defendants' Statement, ¶¶ 3, 4.) Members of the Crisis Intervention and Mental Health units were subsequently brought in, but they too were unable to make Plaintiff comply. (Defendants' Statement, ¶ 4.) Finally, after obtaining authorization from the Superintendent and clearance from the medical unit, officers administered two doses of a chemical agent to gain Plaintiff's compliance. (Defendants' Statement, ¶ 5.) After the second dose, Plaintiff surrendered his hands for cuffing and was removed from his cell. (Defendants' Statement, ¶ 5.) Officers escorted Plaintiff to the decontamination shower, where officers frisked him and a nurse cleaned out his eyes. (Defendants' Statement, ¶ 5.)

**\*2** A sign language interpreter was present during the entire extraction process to communicate with Plaintiff. (Defendants' Statement, ¶ 5.) Pursuant to DOCS policy, the use of the chemical agent and cell extraction were videotaped, and those tapes are part of the record. (Docket No. 40.) As a result of this incident, Plaintiff was again placed on a pre-hearing restricted diet for refusing to return his tray and utensils and for threatening staff with the cup of unknown liquid. (Defendants' Statement, ¶ 10.)

On May 24, 2005, Defendant Kearney conducted a single Tier III hearing regarding a Misbehavior Report arising out of the May 16, 2005 incident, as well as in regard to two other misbehavior reports that were eventually expunged from Plaintiff's record. (Defendants' Statement, ¶ 6.) Two sign language interpreters were present at the hearing. (Defendants' Statement, ¶ 7.) Soon after Defendant Kearney explained that the hearing would involve three misbehavior reports, Plaintiff became uncooperative and refused to look at or acknowledge the interpreters. (Defendants' Statement, ¶ 8.) Because he refused to cooperate or participate in the hearing, Plaintiff was removed, and the hearing continued in his absence. (Defendants' Statement, ¶ 8.)

## III. DISCUSSION

Plaintiff has not responded to Defendants' motion, nor has he at anytime submitted evidentiary support for his claims. In his Complaint, Plaintiff alleges that Defendants

violated his due process rights by (1) serving him a restricted diet meal on May 16, 2005, which was beyond the expiration of the order (Complaint, Docket No. 1, p. 2), (2) shielding his cell beyond May 10, 2005 (Complaint, p. 2), (3) failing to provide a sign language interpreter for his hearings and interactions with staff in May 2005 (Complaint, p. 3), and (4) removing him from his Tier III hearings without cause (Complaint, p. 3). He further alleges that Defendants violated his Eighth Amendment rights by using excessive force against him on May 16, 2005, when the chemical agent was administered, and May 17, 2005, when he was allegedly placed in restraints. (Complaint, p. 3.)

Defendants do not deny that these events generally took place (other than failing to provide a sign language interpreter), but rather, maintain that there is a legitimate reason for each action taken, and that none of Plaintiff's constitutional rights were violated. Moreover, Defendants maintain that even if a constitutional violation occurred, they are entitled to the protections of qualified immunity.

As discussed below, Plaintiff's claims are factually and legally flawed.

### A. Dismissal For Failure to Prosecute

As an initial matter, this case warrants dismissal based on Plaintiff's failure to prosecute, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, which provides that:

> If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it. Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule —except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19—operates as an adjudication upon the merits.

**\*3** FED. R. CIV. P. 41(b).

Where the defendant has not moved under Rule 41(b), a court may nonetheless dismiss a case *sua sponte. Link v. Wabash R.R. Co.,* 370 U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1982); *Lyell Theatre Corp. v. Loews Corp.,*

682 F.2d 37, 42 (2d Cir.1982). In *Link,* the Supreme Court noted that: "[t]he authority of a court to dismiss *sua sponte* for lack of prosecution has generally been considered an 'inherent power,' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link,* 370 U.S. at 630–31.

Rule 41(b) does not define what constitutes failure to prosecute. But the Second Circuit has stated that failure to prosecute "can evidence itself either in an action lying dormant with no significant activity to move it or in a pattern of dilatory tactics." *Lyell Theatre Corp.,* 682 F.2d at 42. Dismissal pursuant to Rule 41(b) falls within the court's discretion. *See id* . at 42–43 ("the scope of review of an order of dismissal is confined solely to whether the trial court has exercised its inherent power to manage its affairs within the permissible range of its discretion"). It is, however, "a harsh remedy to be utilized only in extreme situations." *Harding v. Fed. Reserve Bank,* 707 F.2d 46, 50 (2d Cir.1983) (quoting *Theilmann v. Rutland Hosp., Inc.,* 455 F.2d 853, 855 (2d Cir.1972) (per curiam)); *see also Chira v. Lockheed Aircraft Corp.,* 634 F.2d 664, 665 (2d Cir.1980) (discussing the sanction of dismissal for failure to prosecute as "pungent, rarely used, and conclusive"). This is particularly true in cases involving *pro se* litigants, where dismissal for failure to prosecute should be granted only "when the circumstances are sufficiently extreme." *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996) (citing *Nita v. Connecticut Dep't of Envtl. Prot.,* 16 F.3d 482, 487 (2d Cir.1994)).

The following factors, none of which is dispositive, must be considered in determining whether dismissal for failure to prosecute is warranted: (1) the duration of the plaintiff's failures, (2) whether the plaintiff received notice that further delays would result in dismissal, (3) whether the defendant is likely to be prejudiced by further delay, (4) whether an appropriate balance has been struck between alleviating the court's calendar congestion and protecting the litigants' due process rights, and (5) whether lesser sanctions would be appropriate. *See United States ex rel. Drake v. Norden Sys., Inc.,* 375 F.3d 248, 255 (2d Cir.2004); *Nita,* 16 F.3d at 485; *Feurtado v. City of New York,* 225 F.R.D. 474, 477 (S.D.N.Y.2004) (quoting *Jackson v. City of New York,* 22 F.3d 71, 74 (2d Cir.1994)).

In the present case, these factors weigh in favor of dismissal. It has been more than two years since

this Court directed Plaintiff to respond to Defendants' motion and he has failed to do so. Plaintiff was twice warned that his failure to respond to Defendants' motion could result in dismissal of this case (Docket Nos. 32, 39), and Defendants are prejudiced by the delay. This Court therefore finds that dismissal is warranted for failure to prosecute, and that no lesser sanction would be appropriate. Nonetheless, this Court addresses Defendants' motion on the merits.

**B. Summary Judgment Standard**

**\*4** Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." *Addickes v. S.H. Kress and Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment. *Anderson,* 477 U.S. at 252. A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *D'Amico v. City of N. Y.,* 132 F.3d 145, 149 (2d Cir.1998). That is, there must

be evidence from which the jury could reasonably find for the nonmoving party. *Anderson,* 477 U.S. at 252.

By rule, judgment may also be entered against a party that fails to respond to a properly filed motion for summary judgment, if appropriate. FED. R. CIV. P. 56(e) (2). This district's Local Rules provide for similar relief: a nonmoving party's failure to file and serve an answering memorandum or affidavit may constitute grounds for resolving the motion against it. *See* Local Rule 7(a)(2)(A) and (a)(3).

But failure to oppose or respond to a motion for summary judgment standing alone does not warrant granting the motion: "the district court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law." *See Vt. Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244, 246 (2d Cir.2004) ("failure to respond to [a Rule 56] motion does not alone discharge the burdens imposed on a moving party"); *Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001). If the moving party fails to submit evidence sufficient to meet its burden, "summary judgment must be denied even if no opposing evidentiary matter is presented." *Amaker,* 274 F.3d at 681. Consequently, the Second Circuit has emphasized that district courts " 'in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.' " *Vt. Teddy Bear,* 373 F.3d at 246 (quoting *Custer v. Pan Am. Life Ins. Co.,* 12 F.3d 410, 416 (4th Cir.1993)).

## C. 42 U.S.C. § 1983

**\*5** Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. *See* 42 U.S.C. § 1983. On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution. *See Graham v. Connor,* 490 U.S. 386, 393–94,109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (quoting *Baker v. McCollan,* 443 U.S. 137, 145 n. 3, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979)). Accordingly, as a threshold matter in reviewing claims brought pursuant to § 1983, it is necessary to precisely identify the constitutional violations

alleged. *See Baker,* 443 U.S. at 140. Here, Plaintiff's claims are grounded in the Fourteenth and Eighth Amendments.

## D. Fourteenth Amendment Due Process Claims

The Fourteenth Amendment provides, in pertinent part, that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law...." U.S. CONST. amend. XIV. There are two broad categories of due process claims—substantive and procedural. A substantive due process claim is based upon the deprivation of a constitutionally protected life, liberty, or property interest. *See B.D. v. DeBuono,* 130 F. Supp .2d 401, 431 (S.D.N.Y.2000). A procedural due process claim is based upon the deprivation of a protected life, liberty, or property interest, without notice and an opportunity to be heard. *Id.* at 432–33. With respect to any due process claim—substantive or procedural—"[t]he threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." *Narumanchi v. Bd. of Trs. of Conn. State Univ.,* 850 F.2d 70, 72 (2d Cir.1988).

Thus, to establish a due process violation, an inmate must prove that defendants interfered with his protected liberty interests by satisfying a two-part test: "(1) the confinement or restraint must create an 'atypical and significant hardship in relation to the ordinary incidents of prison life,' *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); and (2) the state must have granted a liberty interest by statute or regulation to be free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) (citing *Sandin,* 515 U.S. at 484).

### 1. Restricted Diet Meals

Plaintiff alleges that Defendant Storms violated his due process rights by giving him a restricted-diet meal on May 16, 2005, allegedly beyond the expiration of the restricted-diet order. (Complaint, p. 2.) But again, Plaintiff has submitted no evidence to support this claim.

Defendant Storms, on the other hand, has submitted a declaration attesting that on May 16, 2005, prison staff placed Plaintiff on a restricted diet from May 16—May 22, 2005, for refusing to return his utensils. (Declaration of P. Storms ("Storms Decl."), Docket No. 35, ¶ 5.) A copy of the pre-hearing restricted-diet order is attached as Exhibit C to Defendant Storms's affidavit. Thus, Defendant Storms provided the restricted-diet meal pursuant to a

proper order. In any event, receiving a single restricted-diet meal, without any further allegation that provision of that meal endangered Plaintiff's health in some way, does not demonstrate an atypical or significant hardship under *Sandin. See Porter v. Wolczyk,* No. 9:04CV708, 2007 WL 397046, at *3 (N.D.N.Y. Jan.30, 2007) ("As applied to a due process claim involving a prisoner's diet, in order to allege an atypical and significant hardship, it is not sufficient merely to allege a dietary restriction, but rather a plaintiff must allege that the restricted diet is nutritionally inadequate or otherwise poses a threat to his physical well being.") (citing cases).

### 2. Cell–Shield Order

**\*6** Plaintiff next alleges that Defendants left a shield on his cell well past the expiration of the cell-shield order, which allegedly expired on May 10, 2005.

A cell-shield order was issued on May 6, 2005, and renewed several times through at least June 7, 2005. (Storms Decl., ¶ 8.) Copies of the cell-shield orders are attached to the Storms Declaration as Exhibit D. Defendants placed the cell shield on Plaintiff's cell pursuant to these orders. (Storms Decl., ¶ 9.) Accordingly, Plaintiff's claim that use of the cell shield beyond May 10, 2005, was unauthorized lacks merit.

In addition, use of the cell shield and renewal of the cell-shield orders did not violate Plaintiff's Fourteenth Amendment due process rights. "It has been held that the daily review of deprivation orders, the availability of the inmate grievance program, and the fact that the inmate has a judicial remedy to challenge deprivation orders, and restraining orders, under CPLR article 78 clearly provide due process of law." *Dawes v. Coughlin,* 964 F.Supp. 652, 658 (N.D.N.Y.1997). Moreover, "courts in this Circuit have found that a prison inmate in New York has no protected liberty interest in confinement in an unshielded cell." *Breazil v. Bartlett,* 998 F.Supp. 236, 243 (W.D.N.Y.1997) (citing *DeMaio,* 877 F.Supp. at 93 and *Young v. Scully,* 91 Civ. 4332, 1993 WL 88144, at *3 (S.D.N.Y. Mar.22, 1993)). As such, no violation of the Fourteenth Amendment occurred.

### 3. Sign Language Interpreter and Removal from Tier III Hearing

Plaintiff alleges that Defendants violated his due process rights by failing to provide a sign language interpreter so that he could understand the proceedings and by removing him from the hearing without cause. (Complaint, p. 3.)

It is well-settled that inmates retain due process rights in prison disciplinary proceedings. *See Porter v. Goord,* 04–CV–485, 2004 WL 2271383, at *2 (W.D.N.Y. Oct.5, 2004) (quoting *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003)). In *Wolff v. McDonnell,* the Supreme Court held that whenever an inmate is subjected to a prison disciplinary proceeding that might result in the deprivation of a liberty interest, prison officials must ensure that certain procedural safeguards are in place. 418 U.S. 539, 563–66, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

For example, the inmate must be provided advance written notice of the charges against him and a written statement by the hearing officer setting forth the evidence relied upon and the reasons for the disciplinary action taken. *Id.* at 563–64. The inmate must also be afforded some opportunity to call witnesses and present documentary evidence. *Id.* at 566. In addition, the hearing tribunal must be sufficiently impartial to guard against "a hazard of arbitrary decision making." *Id.* at 571. Finally, the hearing disposition must be supported by at least "some evidence." *See Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

**\*7** Here, Defendants provided Plaintiff with the assistance of Ann Andzel, who is a certified sign language interpreter. (Declaration of T. Schoellkopf ("Schoellkopf Decl."), Docket No. 34, ¶ 7.) Exhibit B to the Schoellkopf Declaration is a copy of an Assistant Form, demonstrating that Andzel meaningfully assisted Plaintiff in preparation for and at his hearing, including identifying witnesses and document requests. Both Andzel and Plaintiff signed this form. In addition, the transcript of the hearing, which is attached as Exhibit C to the Schoellkopf Declaration, confirms that Plaintiff received Andzel's assistance during the hearing as well. Thus, Plaintiff's claim that he was denied a sign language interpreter and knowledge of the proceedings against him is false.

The transcript of the hearing also demonstrates the falsity of Plaintiff's allegation that Defendants Schoellkopf and Kearney removed him from the Tier III hearing without cause. The transcript reflects that after Defendant Schoellkopf explained his rights to him, Plaintiff became agitated after Defendant Schoellkopf denied his request

to have his handcuffs removed. (Schoellkopf Decl., Exhibit C.) Plaintiff then pulled down his pants and exposed himself to Defendant Schoellkopf and Andzel. (Schoellkopf Decl., Exhibit C.) It was at that point that Defendant Schoellkopf ordered Plaintiff removed. (*Id.*) Similarly, Plaintiff disrupted the hearing conducted by Defendant Kearney. (Defendants' Statement, ¶ 8.) Thus, Defendants Schoellkopf and Kearney did not order Plaintiff removed without cause, and therefore, did not violate Plaintiff's due process rights.

**E. Eighth Amendment Excessive Force Claims**
The Eighth Amendment to the United States Constitution applies to the States through the Fourteenth Amendment and "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." *Wilson v. Seiter,* 501 U.S. 294, 297, 11 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991); U.S. Const. amend. VIII. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being." *Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (quotation and citation omitted). Part of the state's duty is to protect inmates from punishments that are "totally without penological justification." *See Williams v. Fitzpatrick,* No. 03 CV 11, 2006 WL 1889964, at *2 (D.Vt. July 10, 2006) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

Plaintiff's Eighth Amendment excessive force claims are evaluated under a two-prong inquiry: both an objective and subjective prong must be satisfied. *See Warren v. Chakravorty,* No. 03 Civ. 8736, 2006 WL 2067736, at *7 (S.D.N.Y. July 25, 2006). To meet the objective prong, the alleged violation must be "sufficiently serious" by objective standards. *Farmer,* 511 U.S. at 834. To meet the subjective prong, the inmate must show that the prison officials involved had a wanton state of mind when they engaged in the misconduct. *See Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) (quoting *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994)).

 **\*8** *De minimus* use of force is excluded from constitutional recognition, "provided that the use of force is not of a sort repugnant to the conscience of mankind." *Green v. Morse,* No. 00–CV–6533, 2005 WL 1490301, at *2 (W.D.N.Y. June 23, 2005) (quoting *Hudson,* 503 U.S. at 9–10). "Punishments incompatible with the evolving

standards of decency that mark the progress of a maturing society or involving the unnecessary and wanton infliction of pain are repugnant to the Eighth Amendment." *Id.* (alterations omitted).

The Second Circuit has explained an excessive force claim as follows:

> The malicious use of force to cause harm constitutes an Eighth Amendment violation per se whether or not significant injury is evident. This result follows because when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. Nevertheless, a *de minimus* use of force will rarely suffice to state a constitutional claim. Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.

*Griffin v. Crippen,* 193 F.3d at 91 (citations and internal quotations omitted). Thus, "even if the harm inflicted is not significant, if plaintiff can show malicious intent then the objective prong will [ ] almost always be satisfied." *Green,* 2005 WL 1490301, at *3.

Here, Plaintiff alleges that Defendants Sindoni and Boczar used excessive force against him on May 16, 2005, when they administered a chemical agent, and on May 17, 2005, when they allegedly placed him in restraints. The record is clear, however, that Defendants were justified in their use of force.

First, Defendant Sindoni was not personally involved in the administering of the chemical agent. (Declaration of J. Boczar ("Boczar Decl."), Docket No. 37, ¶ 3.) Second, contrary to Plaintiff's allegations, a sign language interpreter was present during the cell extraction on May 16, 2005. (Boczar Decl., ¶ 5.) Finally, there is no dispute that Plaintiff failed to comply with the officers' repeated directives to return his tray and utensils and threatened to throw liquid on the staff. (Boczar Decl., ¶ 4.) Defendants also provided Plaintiff ample opportunity to avoid the use of the chemical agent, and even brought in the Crisis Intervention and Mental Health units to assist in gaining

Plaintiff's compliance. (Boczar Decl., ¶ 4.) Defendants received medical clearance and superintendent approval for use of the chemical agent and discharged only so much of the agent as was required to gain Plaintiff's compliance. (Boczar Decl., ¶ 4.) Accordingly, there is no merit to Plaintiff's claim that Defendants Sindoni and Boczar used excessive force against him on May 16, 2005, when they administered the chemical agent.

As to Plaintiff's claim that his Eighth Amendment rights were violated by the use of restraints, there are no factual allegations set forth in the Complaint concerning this alleged deprivation, beyond the allegation that it occurred. No defendant is identified; no time or place is identified; and no injury (other than the constitutional violation) is alleged. Accordingly, this Court finds that Defendants are entitled to summary judgment on this claim as well.

**F. Qualified Immunity**

 **\*9**  Defendants argue that, even assuming that Plaintiff suffered constitutional deprivations, they are entitled to qualified immunity. Officials are protected from § 1983 liability on the basis of qualified immunity if (1) their actions did not violate clearly established law, or (2) it was objectively reasonable for them to believe that their actions did not violate the law. *See Warren v. Keane, 196 F.3d 330, 332 (2d Cir.1999).* As discussed above, this Court finds that Defendants' treatment of Plaintiff was reasonable in all respects. Moreover, it is objectively reasonable to conclude that Defendants' believed that

their own actions were reasonable. Accordingly, this Court finds that even assuming the existence of a constitutional violation, Defendants are entitled to qualified immunity.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted, and in the alternative, Plaintiff's case is dismissed for failure to prosecute.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 32) is GRANTED.

FURTHER, that in the alternative, Plaintiff's case is dismissed for failure to prosecute, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1598922

Footnotes

1    In support of their Motion for Summary Judgment, Defendants filed the following documents: a memorandum of law; a Rule 56 Statement of Undisputed Facts; the Declaration of T. Schoellkopf, with attached exhibits; the Declaration of P. Storms, with attached exhibits; the Declaration of M. Kearney, with attached exhibits; and the Declaration of J. Boczar, with attached exhibits.

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.



Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)

(Cite as: 1993 WL 88144 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jerry YOUNG, a/k/a Ramadan, Plaintiff,
v.
Charles SCULLY, Thomas A. Coughlin, C. Artuz,
Donald Selsky, Defendants.
Jerry Young a/k/a Ramadan, Plaintiff,
v.
Thomas A. COUGHLIN, III, Bobby Joe Laboy,
Battista, Defendants.
Jerry YOUNG, a/k/a Ramadan, Plaintiff,
v.
C. ARTUZ, Donald Selsky, R. Sanford, Jochnewicz,
Sgt. Defendants.
Jerry YOUNG, a/k/a Ramadan, Plaintiff,
v.
Thomas A. COUGHLIN, III, Commissioner of Dept of
Correctional Services, J. Soto, B. Laboy, A. Kimelman,
Battista, Defendants.
Nos. 91 Civ. 4332(JSM), 91 Civ. 4801(JSM), 91 Civ.
6768(JSM), and 91 Civ. 6769(JSM)

March 22, 1993.
MEMORANDUM OPINION AND ORDER

MARTIN, District Judge:

**\*1** In these consolidated actions, Plaintiff Jerry Young ("Young"), a state prisoner, is suing several correction officials for damages under 42 U.S.C. § 1983 for alleged due process violations in (i) the conduct of his disciplinary hearings at Green Haven Correctional facility; and (ii) his confinement in a plexiglass cell and the issuance of a deprivation order. The Plaintiff further alleges that the denial of privileges during his confinement violated both his first and eighth amendment rights. The parties now cross move for summary judgment.

FACTUAL BACKGROUND

Plaintiff first challenges the constitutionality of six disciplinary hearings, claiming that he was denied his constitutional right to call witnesses of his choosing.

During these hearings, Young requested one or more of the following as witnesses: Commissioner Coughlin, Department of Correctional Facilities ("DOCS") Special Housing Director Selsky, DOCS Inspector General Brian Malone, Green Haven Superintendent Scully, First Deputy Superintendent Artuz, Deputy Superintendent for Security Demski, United States District Judge Kram, Inmate Aramas, and Inmate Codrington. Plaintiff also alleges that he was denied his right to effective employee assistance.

Plaintiff next contends that his denial of privileges from January 6, 1991 through January 10, 1991 and his confinement in a plexiglass cell from January 10, 1991 through January 14, 1991 and again from February 22, 1991 to March 2, 1991 were without notice of charges or hearing, and thus violated his due process rights.

Lastly, Plaintiff challenges his denial of privileges during confinement on the ground that the deprivation amounted to cruel and inhuman punishment in violation of his eighth amendment rights. He also asserts that certain deprivations violated his first amendment rights.

DISCUSSION

1. The Conduct of the Disciplinary Hearings

The Supreme Court has recognized an inmate's right to call witnesses at prison disciplinary hearings. Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963 (1974). However, this right is "necessarily circumscribed by the penological need to provide swift discipline in individual cases." Ponte v. Real, 471 U.S. 491, 495, 105 S.Ct. 2192, 2195 (1985). Specifically, the right to call witnesses is subject to the "mutual accommodation between institutional needs and objectives and the provisions of the Constitution." Baxter v. Palmigiano, 425 U.S. 308, 321, 96 S.Ct. 1551, 1559 (1976). The Supreme Court has held that a hearing officer may refuse to call a witness (i) if granting the request would be "unduly hazardous to institutional safety or correctional goals"; (ii) if necessary "to keep the hearing within reasonable limits"; or (iii) for reasons of "irrelevance" or "lack of necessity." Wolff, 418 U.S. at 566, 94 S.Ct. at 2980; see also Ponte, 471 U.S. at 496–977, 105 S.Ct. at 2195–96.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)

(Cite as: 1993 WL 88144 (S.D.N.Y.))

In the case at hand, the hearing officer denied Plaintiff's request to call the following witnesses: DOCS Commissioner Coughlin, Special Housing Director Selsky, Inspector General Brian Malone, Green Haven Superintendent for Security Demskie, and U.S. District Judge Kram. None of these requested witnesses had any personal knowledge of the incidents that gave rise to the disciplinary charges. As such, the hearing officer's refusal to call these witnesses on the ground of relevance did not violate Plaintiff's qualified right to call witnesses since, consistent with due process, the hearing officer could refuse to call the witnesses for that very reason.[FN1]

**\*2** The hearing officer was also correct in refusing to require the testimony of two inmate witnesses, Aramas and Codrington. One hearing concerned an altercation which occurred in the showers of the cell block. The hearing officer refused to call Aramas and Codrington on the ground that their testimony would be irrelevant. The hearing officer found that at the time of the incident the two inmates "were locked in their cell, they were not in the shower with Young, did not see what happened, and could not hear what was ordered by staff." Mindful of the Supreme Court's admonition in *Wolff* that "[w]e should not be too ready to exercise oversight and put aside the judgment of prison administrators," *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2979, we refuse to disturb the hearing officer's finding.

Plaintiff Young further asserts that his due process rights were violated in that he was not allowed to call inmate Codrington in connection with two other hearings. Young misapprehends the facts. Contrary to Young's assertion, Codrington was not prohibited from testifying. Rather, the record indicates that Codrington of his own volition refused to testify. As there is no right to compel an inmate to testify, *see, e.g., Smith v. Coughlin,* No. 89–0321, slip op. (N.D.N.Y. April 8, 1992), Young's claim based on inmate Codrington's refusal to testify must fail.[FN2]

Lastly, while an inmate is entitled to effective employee assistance, *Eng v. Coughlin,* 858 F.2d 889, 897–98 (2d Cir.1988), such assistance is qualified. Here, Young contends that Defendant Jochnewicz, Young's employee assistant in one hearing, is liable for failing to

interview various prison officials and inmate Codrington. However, as mentioned earlier, these officials had no personal knowledge of the incident. Interviewing these Defendants would have been fruitless and as such was not required. As for Codrington, Young once again misapprehends the facts. Codrington, the only one of the four Defendants with knowledge relevant to Young's hearing, was in fact interviewed. As such, Young received effective employee assistance.

*2. The Plexiglass Confinement and Deprivation Order*

Plaintiff alleges that he was confined to a plexiglass cell and deprived of certain privileges without notice or hearing in violation of his due process rights. In evaluating his claim, we must first determine whether a protected liberty interest was infringed and, if so, whether the procedures employed by the state afforded the Plaintiff adequate due process.

State regulations create a constitutionally protected liberty interest when they establish substantive limitations on official discretion and contain "explicitly mandatory language, i.e., specific directives to the decision maker that if the regulations' substantive predicates are not present, a particular outcome must follow." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 462–64, 109 S.Ct. 1904, 1910 (1989); *see also Hewitt v. Helms,* 459 U.S. 460, 471–72, 103 S.Ct. 864 (1983); *Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Russell v. Coughlin,* 910 F.2d 75, 77 (2d Cir.1990).

**\*3** Turning to Young's claim that he was confined to a plexiglass cell without due process, we note that regulation 7 N.Y.C.C.R. § 305.6, while containing substantive predicates to guide official decision making concerning the use of plexiglass shields, "stop short of requiring that a particular result is to be reached," *Thompson,* 490 U.S. at 462, 109 S.Ct. at 1910. Specifically, § 305.6(b) provides that "[c]ell shields *may* be applied for good cause including, but *not limited to,* the reasons listed below." 7 N.Y.C.C.R. § 305.6(b) (emphasis added). The words "may" and "not limited to" make it clear that the official's decision is discretionary and is not limited to enumerated substantive predicates. The failure of the regulation to provide mandatory language or criteria defeats Young's claim that the regulation creates a liberty

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)

(Cite as: 1993 WL 88144 (S.D.N.Y.))

interest.

By contrast, the language in Regulation 7 N.Y.C.C.R. § 305.2(a), by requiring specific substantive predicates for issuance of deprivation orders, creates a liberty interest which may not be deprived without due process.[FN3] Section 305.2(a) provides that "[a]n order depriving an inmate of a specific item, privilege or service may be issued when it is determined that a threat to the safety or security of staff, inmates, or state property exists." 7 N.Y.C.C.R. § 305.2(a). As such, the issuance of deprivation orders is limited to situations in which a threat is present. In so limiting the issuance of deprivation orders, New York State has created a liberty interest and must accordingly provide procedural safeguards. However, an inmate is not necessarily entitled to a full panoply of procedural safeguards. The process required is determined by balancing the private interest affected against the interests and concerns of the government. Here, in an administrative confinement, the balancing test tips in favor of the government's compelling interest in maintaining prison security, and "an informal, nonadversary review" is sufficient to satisfy the due process requirement. *Hewitt,* 459 U.S. at 476, 103 S.Ct. at 873; *Patterson v. Coughlin,* 761 F.2d 886, 980–81 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879 (1986). Accordingly, due process is satisfied if the inmate is provided with "notice of the charge against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." *Hewitt,* 459 U.S. at 476, 103 S.Ct. at 873; *see also Gittens v. Lefevre,* 891 F.2d 38, 40 (2d Cir.1989).

Here, the record is unclear as to whether Young received sufficient due process. The record indicates that Young did pose a threat to safety, that the deprivation order was reviewed and approved by a second correction official before being issued, and that the deprivation order was reviewed daily to determine if it was necessary to be continued. However, the record is silent as to whether Young was given an opportunity to voice his objections " 'at a meaningful time and in a meaningful manner.' " *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191 (1965)); *Giglio v. Dunn,* 732

F.2d 1133, 1135 (2d Cir.), *cert. denied,* 469 U.S. 932, 105 S.Ct. 328 (1984).

**\*4** While a more complete record would be helpful, we need not pass on this issue today. This is because we conclude that summary judgment should be awarded to the Defendants on the ground that the officials are shielded under the doctrine of qualified immunity. Specifically, state officials are shielded "from personal liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights." *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991), *cert. denied,* 112 S.Ct. 3032 (1992) (citations omitted); *see also Robison v. Via,* 821 F.2d 913, 920–21 (2d Cir.1987); *Krause v. Bennett,* 887 F.2d 362, 368 (2d Cir.1989). An official will enjoy immunity when his actions were objectively reasonable when assessed in the light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 2739 (1982).

Here, the regulation at issue, while containing mandatory language, also contained permissive language, and as such ambiguity existed. Nor could it be said that case law on the subject was sufficiently clear to preclude immunity. We are aware of no decisions issued prior to the incidents in this case recognizing a liberty interest in remaining free from the restraints imposed through deprivation orders. Indeed, such deprivations had been found not violative of due process in at least two state court decisions. *See Bogle v. Coughlin,* 569 N.Y.S.2d 831 (3d Dep't 1991); *Malik v. Coughlin,* 550 N.Y.S.2d 219 (3d Dep't 1990). Because we find that case law was not clearly established in this area, it cannot be said that the actions taken by the Defendants were unreasonable and contrary to clearly established law. Accordingly, the Defendants are entitled to good faith immunity as a matter of law.

*3. The Denial of Cell Privileges and Property*

In Plaintiff's brief in support of his cross-motion for summary judgment, he asserts that his confinement and the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)

(Cite as: 1993 WL 88144 (S.D.N.Y.))

accompanying deprivations amounted to cruel and unusual punishment. Specifically, Plaintiff alleges that he was denied exercise, shower and hot water, cell cleaning equipment, wardrobe and hygiene articles, and religious and legal books "without penological justification."

It is well settled that the eighth amendment, which applies to states through the due process clause of the fourteenth amendment, *Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 1420 (1962), prohibits "cruel and unusual" punishment suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285 (1976).

However, to establish an eighth amendment claim based on a post-sentencing deprivation, a plaintiff must go beyond showing that the deprivation constitutes an "unnecessary and wanton infliction of pain." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2400 (1981). The plaintiff must also establish that the defendants acted with the requisite intent. *Wilson v. Seiter,* 111 S.Ct. 2321, 2324 (1991). Stated differently,

**\*5** After incarceration, only the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment. To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety.... It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.

*Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citations omitted; internal quotations omitted).

Turning to the facts at hand, we must conclude that the Plaintiff's allegations, except for one, fail to satisfy the objective requirement of serious deprivation articulated in *Rhodes. Rhodes* holds that the objective element is satisfied where punishment results "in unquestioned and serious deprivations of basic human needs" or "deprive[s] inmates of the minimal civilized measure of life's

necessities." *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399 (1981). Here, no such egregious deprivation occurred.

The record shows, and Plaintiff does not dispute, that for the most part the deprivations complained of were imposed to safeguard institutional security and specifically the safety of other correctional staff. The record also shows that the deprivations complained of were *de minimis* in nature and lasted only for a period of several days. None of the deprivations, the curtailing of exercise and shower privileges, or the surrender of toiletries and books, rose to the level of extreme deprivation. Furthermore, as we "do not sit to supervise state prisons," *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532 (1976), we defer to the experience of the Defendants in concluding that these deprivations were both necessary and justified. Because Young has failed to establish the elements of an eighth amendment claim, these claims fail as a matter of law and summary judgment is properly awarded to the Defendants.

Our decision today is not without support. Courts have routinely held that claims such as Young's fail to amount to cruel and unusual punishment. *See, e.g., Green v. Ferrell,* 801 F.2d 765, 771–72 (5th Cir.1986) (denial of exercise for limited duration); *Leonard v. Norris,* 797 F.2d 683, 685 (8th Cir.1986) (denial of exercise privileges for fifteen days); *Johnson v. Williams,* 768 F.Supp. 1161, 1167 (E.D.Va.1991) (limitations on exercise upheld); *Scher v. Purkett,* 758 F.Supp. 1316 (E.D.Mo.1991) (denial of shampoo and deodorant); *Jackson v. Ward,* 458 F.Supp. 546 (W.D.N.Y.1978) (upholding limitations on access to written materials); *Jordan v. Arnold,* 408 F.Supp. 869 (M.D.Pa.1976) (two showers and two hours of exercise per week sufficient); *Spain v. Procunier,* 408 F.Supp. 534 (N.D.Cal.1976) (short term denial of shower privileges), *aff'd in part on other grounds, rev'd in part on other grounds,* 600 F.2d 189 (9th Cir.1979).

**\*6** Young also asserts that, as part of the deprivation order, he was essentially "stripped"; i.e., deprived of "soap, toothpaste, toothbrush, showers, mattress, blanket, sheets, pillow, pillowcase, toilet paper, pants, shirt, undershirt, socks, shoes, slippers." However, evidence submitted by the government has shown that, contrary to Plaintiff's allegations that he was confined naked in a bare

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)

(Cite as: 1993 WL 88144 (S.D.N.Y.))

cell, *see Wright v. McMann,* 460 F.2d 126, 129 (2d Cir.) (strip cell confinement cruel and unusual), *cert. denied,* 409 U.S. 885, 93 S.Ct. 115 (1972); *LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir.1972) (same), *cert. denied,* 414 U.S. 878, 94 S.Ct. 49 (1973), Plaintiff was at all times provided with at least a "tee shirt, undershorts, paper slippers or socks, a mattress, and a blanket at nighttime." Affidavit of Bobbie Jo LaBoy ("LaBoy Aff."). Such treatment does not rise to the level of extreme deprivation required of an eight amendment violation, for the reasons stated above.

### 4. Access to Religious and Legal Materials

The Second Circuit has stated:
In the close and restrictive atmosphere of a prison, first amendment guarantees taken for granted in society at large assume far greater significance. The simple opportunity to read a book or write a letter, whether it expresses political views or absent affections supplies a vital link between the inmate and the outside world, and nourishes the prisoner's mind despite the blankness and bleakness of his environment. Accordingly, courts have jealously protected the inmate in his exercise of first amendment prerogatives.

*Wolfish v. Levi,* 573 F.2d 118, 129 (2d Cir.1978), *rev'd,* 441 U.S. 520, 99. S.Ct. 1861 (1979).

A prisoner's first amendment rights, however, are not unlimited: "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049 (1948). Thus a prisoner's first amendment rights must yield when "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system," *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974), although these restrictions must be "reasonably adapted to achieving a penological objective," *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 2404 (1987); *see also Young v. Coughlin,* 866 F.2d 567 (2d Cir.), *cert. denied,* 492 U.S. 909, 109 S.Ct. 3224 (1989).

Here, Young alleges that he was denied access to

religious books for a period of several days, thus depriving him of his first amendment right to freedom of religion. Defendants have not denied this allegation. Evidence presented by the government shows that the removal of Plaintiff's religious books was the result of an incident in which Plaintiff threw coffee at a prison employee. LaBoy Aff. p. 3 & Exhibit B. Plaintiff was deprived of all items, except those listed above, "to protect the safety of Green Haven corrections staff from assault by plaintiff, particularly with any objects in plaintiff's possession." *Id.* If these were the only facts relevant to Plaintiff's claim, the Court would have little trouble determining that such actions were reasonably adopted to penological objectives.

**\*7** But the ostensible safety objective cited by the Government, that of "maintaining the security of the facility and specifically the safety of correction staff from being assaulted with any objects in plaintiff's possession," Government's Sur–Reply Memorandum at 6, is called into question by evidence that Plaintiff would have been allowed *other* books even during this period of deprivation: "The inmate, however, continues to have access to the law library; he must fill out a request form, and the requested books or other materials are delivered to his cell, usually within 24 hours." LaBoy Aff. at 4. While this Court has no desire to condemn a prison administration's admirable attempts to allow inmates access to legal materials, it is difficult to see how religious books can be a threat to the safety of the officers of a facility while legal books are not. However, there is no need to rule on this issue, because it is plain that Plaintiff has not demonstrated culpability.

There is no evidence in the record that the alleged deprivation of Plaintiff's first amendment rights involved any degree of fault by defendants. Nothing indicates that the books were removed with awareness that any of them were integral to Plaintiff's practice of his religion, or that the authorities later received notice of this fact. In short, there is no evidence that the defendants knew or should have known that they were depriving Plaintiff of his first amendment rights, if in fact they were. "Negligence alone will not carry a § 1983 action," *Paulsen v. Gotbaum,* 1992 WL 8361, \*8 (S.D.N.Y.), *aff'd,* 982 F.2d 825 (2d Cir.1992); here there was not even proof of negligence. Furthermore, even if a *prima facie* case under § 1983 were

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)

(Cite as: 1993 WL 88144 (S.D.N.Y.))

made out, defendants would still be entitled to qualified immunity for their actions taken in good faith; once this defense is raised, it is Plaintiff's burden to defeat it. *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). Thus, because there is no genuine issue of material fact as to whether defendants acted culpably or are entitled to good faith immunity, summary judgment for defendants is appropriate.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED; all claims are DISMISSED in their entirety. Plaintiff's motion for summary judgment is DISMISSED as moot.

SO ORDERED.

FN1. Plaintiff counters that "he wrote several complaints to [these officials] about [other] officials harassing him into violating prison rules and since mitigating [sic] is a factor which the hearing officer must consider in determining his sentences their testimony was relevant at least to the issue of punishment." This argument is tenuous at best. Accordingly, we decline to disturb the hearing officer's determination.

FN2. Citing *Silva v. Scully,* 526 N.Y.S.2d 532 (2d Dep't 1988), Young notes that before a hearing officer may refuse to call a witness, the hearing officer must "explore their reasons for not testifying" and communicate these reasons to the inmate. *Silva,* 526 N.Y.S.2d at 534. *See also Barnes v. LeFevre,* 511 N.Y.S.2d 591 (1986); *Briggs v. Lord,* 524 N.Y.S.2d 335 (Sup.Ct.1988). No such explanation is required under federal law. *Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 2196 (1985). It is well settled that violations of state procedural rules do not of their own accord implicate federal law. *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 229 (1987); *Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir.1985); *Smallwood–El v. Coughlin,* 589 F.Supp. 692, 699 (S.D.N.Y.1984). As such, we decline to hold today that the officer's failure to

demand an explanation amounts to a constitutional violation redressable under § 1983.

FN3. Young contends that separate liberty interests were created in the right to shower, exercise, and maintain personal property. We need not address this contention, however, since privileges cited by Young may be denied upon issuance of a deprivation order. As such, we confine our discussion to whether a liberty interest has been created in remaining free from the restraints imposed by a deprivation order.

S.D.N.Y.,1993.

Young v. Scully
Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



LEXSEE 1995 U.S.DIST. LEXIS 7136

**MINA POURZANDVAKIL, Plaintiff, -against- HUBERT HUMPHRY, JUDISICIAL SYSTEAM OF THE STATE OF MINNESOTA AND OLMESTED COUNTY COURT SYSTEAM, AND STATE OF MINNESOTA, SAINT PETER STATE HOSPITAL, DOCTOR GAMMEL STEPHELTON, ET EL ERICKSON, NORTH WEST BANK AND TRUST, OLMESTED COUNTY SOCIAL SERVICE, J.C. PENNY INSURNCE, METMORE FINICIAL, TRAVELER INSURNCE, COMECIAL UNION INSURNCE, HIRMAN INSURNCE, AMRICAN STATE INSURNCE, FARMERS INSURNCE, C. O BROWN INSURNCE, MSI INSURNCE, STEVEN YOUNGQUIST, KENT CHIRSTAIN, MICHEAL BENSON, UNITED AIRLINE, KOWATE AIRLINE, FORDMOTOR CRIDITE, FIRST BANK ROCHESTER, GEORGE RESTWICH, BRITISH AIRWAYS, WESTERN UNION, PRUDENIAL INSURNCE, T.C.F. BANK, JUDGE SANDY KIETH, JUDGE NIERGARI, OLMESTEAD COUNTY JUDGERING, JUDGE MORES, JUDGE JACOBSON, JUDGE CHALLIEN, JUDGE COLLIN, JUDGE THOMASE, JUDGE BUTTLER, JUDGE MORKE, JUDGE MOWEER, SERA CLAYTON, SUSAN MUDHAUL, RAY SCHMITE, Defendants.** [1]

1  Names in the caption are spelled to reflect plaintiffs complaint.

Civil Action No. 94-CV-1594

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK

*1995 U.S. Dist. LEXIS 7136*

May 22, 1995, Decided
May 23, 1995, FILED

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff filed a complaint accusing defendants with kidnapping plaintiff and her daughter, torturing plaintiff in the Mayo Clinic, and causing plaintiff and her daughter to suffer physically, financially, and emotionally. Certain defendants sought vacation of the defaults entered against them without proper service, some sought dismissal of the complaint, and some sought both vacation of the defaults and dismissal.

**OVERVIEW:** Plaintiff served defendants by certified mail. The court determined that such service was not authorized under federal law or under either New York or Minnesota law. Additionally, plaintiff's extraterritorial service of process was not effective under *Fed. R. Civ. P.*

*4(k)*. Defendants were not subject to federal interpleader jurisdiction, and they were not joined pursuant to *Fed. R. Civ. P. 14* or *Fed. R. Civ. P. 19*. No federal long-arm statute was argued as a basis for jurisdiction, and the alleged harm did not stem from acts in New York for jurisdiction under *N.Y. C.P.L.R. § 302(a)*. The complaint showed no basis for subject matter jurisdiction against defendants that were insurance companies with no apparent relationship to claims of rape, torture, harassment, and kidnapping, and the court found that no basis for supplemental jurisdiction under *28 U.S.C.S. § 1367(a)* existed. Venue was clearly improper under *28 U.S.C.S. § 1391(b)* because no defendant resided in the district and none of the conduct complained of occurred there. Plaintiff's claims of civil rights violations were insufficient because her complaint was a litany of general conclusions, not specific allegations of fact.

**OUTCOME:** The court vacated all defaults. The court dismissed plaintiff's complaint against all moving and non-moving defendants. The dismissal of the complaint against certain defendants premised on the court's lack of power either over the person of the defendant or the subject matter of the controversy was without prejudice, but dismissals against the remaining defendants were with prejudice. Requests for sanctions and attorney's fees were denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Service of Process > Methods > Residential Service*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Service Upon Agents*
*Governments > Federal Government > Employees & Officials*
[HN1] Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. *Fed. R. Civ. P. 4(e)(2)*. Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. *Fed. R. Civ. P. 4(e)(1)*.

*Business & Corporate Law > Agency Relationships > Agents Distinguished > General Overview*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Mail*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Service Upon Corporations*
[HN2] Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. *Fed. R. Civ. P. 4(h)(1), 4(e)(1)*.

*Civil Procedure > Pleading & Practice > Service of Process > Methods > General Overview*
[HN3] Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *N.Y. C.P.L.R. §§ 308, 311* (Supp. 1995); *N.Y. Bus. Corp. Law § 306* (Supp. 1995); *Minn. Stat. § 543.08* (1995); Minn. R. 4.03 (1995).

*Civil Procedure > Pleading & Practice > Service of Process > Methods > Mail*
*Civil Procedure > Pleading & Practice > Service of Process > Time Limitations > General Overview*
*Governments > Local Governments > Claims By & Against*
[HN4] Service on states, municipal corporations, or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. *Fed. R. Civ. P. 4(j)(2)*. Minnesota law does not authorize service on a governmental entity by certified mail. Minn. R. 4.03(d), (e) (1995).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Parties > Interpleaders > General Overview*
[HN5] A plaintiff's extraterritorial service of process in New York can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York state; (2) if the defendant is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to *Fed. R. Civ. P. 14* or *Fed. R. Civ. P. 19* and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be subject to jurisdiction in the courts of general jurisdiction in any state of the United States. *Fed. R. Civ. P. 4(k)*.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
[HN6] *N.Y. C.P.L.R. § 302(a)* provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain minimal contacts between the defendant and the state such as transacting any business in the state and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General*

*Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Same Case & Controversy*
[HN7] *28 U.S.C.S. § 1367(a)* requires a relationship between the state and federal claims for pendent jurisdiction so that they form part of the same case or controversy.

*Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship > General Overview*
*Civil Procedure > Venue > Multiparty Litigation*
[HN8] See *28 U.S.C.S. § 1391(a).*

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Federal Questions > General Overview*
*Civil Procedure > Venue > Multiparty Litigation*
[HN9] See *28 U.S.C.S. § 1391(1).*

*Civil Procedure > Venue > Federal Venue Transfers > Improper Venue Transfers*
*Civil Procedure > Venue > Individual Defendants*
*Civil Procedure > Venue > Multiparty Litigation*
[HN10] Where venue is laid in the wrong district, the court shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought. *28 U.S.C.S. § 1406(a).*

*Civil Procedure > Venue > Motions to Transfer > General Overview*
*Civil Procedure > Judicial Officers > Judges > Discretion*
*Governments > Legislation > Statutes of Limitations > General Overview*
[HN11] The purpose of the court's discretionary authority to transfer rather than dismiss in cases of improperly laid venue is to eliminate impediments to the timely disposition of cases and controversies on their merits.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*
[HN12] Where a court has already dismissed against the moving parties on jurisdictional grounds, it has no power to address a *Fed. R. Civ. P. 12(b)(6)* issue.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*

*Civil Rights Law > General Overview*
[HN13] Complaints that rely on civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights instead of a litany of general conclusions that shock but have no meaning.

*Civil Procedure > Parties > Self-Representation > Pleading Standards*
[HN14] A pro se plaintiff's complaint must be construed liberally and should be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
*Civil Procedure > Parties > Self-Representation > Pleading Standards*
[HN15] Even pro se complaints must show some minimum level of factual support for their claims.

*Civil Procedure > Parties > Self-Representation > General Overview*
*Civil Procedure > Counsel > Appointments*
*Civil Rights Law > Prisoner Rights > Prison Litigation Reform Act > Claim Dismissals*
[HN16] The United States Supreme Court explicitly has acknowledged a district court's power under *28 U.S.C.S. § 1915(d)* to dismiss as frivolous a complaint that lacks an arguable basis either in law or in fact. The Supreme Court has explicitly declined to rule, however, on whether a district court has the authority to dismiss sua sponte frivolous complaints filed by non-indigent plaintiffs. The law in the district of New York is that a district court may sua sponte dismiss a frivolous complaint even if the plaintiff has paid the filing fee.

**COUNSEL:** [*1] HUBERT H. HUMPHREY, III, Attorney General of the State of Minnesota, Attorney for Hubert H. Humphry, III, Judicial System of the State of Minnesota, St. Peter Regional Treatment Center, Gerald Gammell, MD, William Erickson, MD, Thomas Stapleton, MD, the Honorable James L. Mork, Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen, and Judge Lawrence Collins, St. Paul, MN, OF COUNSEL: JEROME L. GETZ, Assistant Attorney General.

CONDON & FORSYTH, P.C., Attorneys for British Airways, P.L.C. and Kuwait Airways Corp., New York, NY, OF COUNSEL: STEPHEN J. FEARON, ESQ., MICHAEL J. HOLLAND, ESQ.

DUNLAP & SEEGER, P.C., Attorneys for Olmsted County, Raymond Schmitz, Susan Mundahl, Norwest Bank Minnesota, N.A. (the Northwest Bank & Trust), C.O. Brown Agency, Inc., Rochester, MN, OF COUNSEL: GREGORY J. GRIFFITHS, ESQ.

ARTHUR, CHAPMAN, McDONOUGH, KETTERING & SMETAK, P.A., Attorneys for J.C. Penney Insurance Co. and Metropolitan Insurance Co., Minneapolis, MN, OF COUNSEL: EUGENE C. SHERMOEN, JR., ESQ.

SHAPIRO & KREISMAN, Attorneys for Metmor Financial, Inc., Rochester, NY, OF COUNSEL: JOHN A. DiCARO, ESQ.

COSTELLO, COONEY & FEARON, Attorneys [*2] for Travelers Insurance Companies; Hirman Insurance; Commercial Union Insurance Companies, Syracuse, NY, OF COUNSEL: PAUL G. FERRARA, ESQ., ROBERT J. SMITH, ESQ.

SMITH, SOVIK, KENDRICK & SUGNET, P.C., Attorneys for American States Insurance Co. and Prudential Insurance Co., Syracuse, NY, OF COUNSEL: THOMAS N. KAUFMANN, ESQ.

STEVEN C. YOUNGQUIST, ESQ., Pro Se, Rochester, MN.

THOMAS J. MARONEY, United States Attorney, Attorney for Michael Benson, Postmaster, Northern District of New York, Syracuse, NY, OF COUNSEL: WILLIAM F. LARKIN, Assistant United States Attorney.

GEORGE F. RESTOVICH & ASSOCIATES, Attorneys for George F. Restovich, Esq., Rochester, MN, OF COUNSEL: GEORGE F. RESTOVICH, ESQ.

CONBOY, McKAY, BACHMAN & KENDALL, L.L.P., Attorneys for Western Union, Watertown, NY, OF COUNSEL: GEORGE K. MYRUS, ESQ.

RICHARD MAKI, Pro Se, Rochester, MN.

**JUDGES:** ROSEMARY S. POOLER, UNITED STATES DISTRICT JUDGE

**OPINION BY:** ROSEMARY S. POOLER

**OPINION**

***MEMORANDUM-DECISION AND ORDER***

**INTRODUCTION**

In the four and one-half months since she filed this action, plaintiff Mina Pourzandvakil has filed three amended complaints and ten motions. She also has sought and received [*3] entry of default against ten defendants, none of whom she properly served. She twice has sought and been denied temporary restraining orders. She has included in her action defendants with no apparent connection to this forum, that were vindicated in actions she brought in other forums.

In response, several individual defendants and groups of defendants have filed a total of twelve motions, some seeking vacation of the defaults entered against them, some seeking dismissal and others seeking both. We grant defendants' motions insofar as they seek vacation of the clerk's entries of default and dismissal of the complaint. We vacate *sua sponte* the entries of default against the non-moving defendants. Finally, we dismiss the complaint in its entirety against all defendants.

**BACKGROUND**

Pourzandvakil commenced this action by filing a complaint in the Office of the Clerk on December 9, 1994 (Docket No. 1). The complaint named as defendants the Attorney General of the State of Minnesota, the State of Minnesota and Olmsted County, Minnesota judicial systems, various Minnesota judges and prosecutors, St. Peter State Hospital in Minnesota and various doctors who worked at St. Peter's. [*4] Without specifying the time or defendant involved, the complaint accused the defendants of kidnapping Pourzandvakil and her daughter, torturing Pourzandvakil in the Mayo Clinic since April 1985, and causing Pourzandvakil and her daughter to suffer physically, financially and emotionally. Pourzandvakil twice requested that we issue a temporary restraining order. We denied both requests. *See* Order entered December 14, 1994 (Docket No. 4) and Memorandum-Decision and Order entered December 22, 1994 (Docket No. 6).

On December 27, 1994, Pourzandvakil filed an amended complaint (the "first amended complaint") (Docket No. 7) that appears to differ from the original complaint by adding British Airways as a defendant without making any allegations against British Airways. The first amended complaint also differs by requesting additional damages for prior cases and adding descriptions of several previous cases. Annexed to the first amended complaint is another document labeled amended complaint (the "annexed amended complaint") (Docket No. 7) whose factual allegations differ substantially from both the original complaint and the first amended complaint. The annexed amended complaint also [*5] adds British Airways as a party but specifies only that Pourzandvakil has travelled on that airline and that British Airways, along with other airlines on which Pourzandvakil has travelled, is aware of all the crimes committed against her.

Pourzandvakil filed yet another amended complaint

on January 13, 1995 (the "second amended complaint") (Docket No. 11). The second amended complaint adds as defendants several banks, other financial institutions, insurance companies, insurance agents or brokers, attorneys and airlines as well as the Postmaster of Olmsted County and Western Union. The allegations against these defendants defy easy summarization and will be addressed only insofar as they are relevant to the various motions.

The Clerk of the Court has entered default against the following defendants: J.C. Penny Insurnce (sic) [2] ("J.C. Penney"), British Airways, Kowate (sic) Airline ("Kuwait"), MSi Insurnce (sic) ("MSI"), Judge Mork, Steven Youngquist ("Youngquist"), Prudncial Insurnce (sic) ("Prudential"), Ford Motor Credit ("Ford"), First Bank Rochester, and TCF Bank ("TCF"). Based on the submissions Pourzandvakil made in support of her requests for entry of default,  [*6]  it appears that she served these defendants by certified mail.

The court has received answers from the following defendants: Hubert H. Humphrey III, St. Peter Regional Treatment Center, and Drs. Gerald H. Gammell, William D. Erickson, and Thomas R. Stapleton (joint answer filed January 9, 1995); Olmsted County, Ray Schmitz ("Schmitz"), Susan Mundahl ("Mundahl"), C.O. Brown Agency, Inc. ("C.O. Brown") (answer to amended complaint filed January 23, 1995); George Restovich ("Restovich") (answer to complaint or amended complaint filed January 30, 1995); Norwest Corporation ("Norwest") (answer to amended complaint filed January 31, 1995, amended answer of Norwest Bank Minnesota, N.A. to amended complaint filed February 13, 1995); Travelers Insurance Company ("Travelers") (answer filed February 1, 1995); Michael Benson ("Benson") (answer filed February 6, 1995); Hirman Insurance ("Hirman") (answer filed February 6, 1995); Richard Maki ("Maki") (answer to complaint or amended complaint filed February 17, 1995); Western Union (answer filed February 21, 1995); Steven C. Youngquist ("Youngquist") (answer to complaint or amended complaint filed February 23, 1995); Kuwait (answer filed March [*7] 6, 1995); J.C. Penney (answer filed March 22, 1995); Susan E. Cooper [3] (answer to amended complaint filed March 24, 1995); and Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen and Judge Lawrence Collins (joint answer filed April 3, 1995).

> 2    Plaintiff's spelling is idiosyncratic, and we preserve the spelling in its original form only where absolutely necessary for accuracy of the record. Otherwise we substitute the word we believe plaintiff intended for the word she actually wrote, e.g., "tortured" for "tureared."

The court has also received a total of ten motions from Pourzandvakil since February 27, 1995. She moved

for a default judgment against defendants J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways, and TCF. She moved for immediate trial and "venue in a different place" against several defendants and also requested action according to law and criminal charges. Finally, she made motions opposing defendants' motions.

> 3    Susan E. Cooper is not named as a defendant in the original complaint or any amended complaint filed with this court. From correspondence with Cooper's attorney, it appears that plaintiff sent Cooper a copy of a different version of the complaint. Because the original of this version was not filed with the court, no action against Cooper is pending in this court.

[*8]  The court also has received a total of thirteen motions [4] from defendants. Several of the defendants moved for dismissal either under Rule 56 or *Rule 12 of the Federal Rules of Civil Procedure*. For instance, Commercial Union Insurance Companies ("Commercial") moved for dismissal of Pourzandvakil's complaint pursuant to *Fed. R. Civ. P. 12(b)* or, in the alternative, for a more definite statement. Commercial argued that Pourzandvakil's complaint against it is barred by *res judicata* and collateral estoppel and that this court does not have subject matter jurisdiction over the complaints against Commercial. American States Insurance Company ("ASI") moved for dismissal based on plaintiff's failure to state a claim upon which relief can be granted. ASI further moved for an order enjoining Pourzandvakil from further litigation against it. Maki moved for summary judgment based on lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim upon which relief can be granted, and lack of subject matter jurisdiction. Hubert H. Humphrey, III, the Judicial System of the State of Minnesota, Judge James L. Mork, St. Peter Regional Treatment Center and Drs. Gammell, Erickson [*9] and Stapleton (collectively, the "state defendants") moved for summary judgment alleging lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim on which relief can be granted, lack of subject matter jurisdiction, sovereign immunity, and, on behalf of Judge Mork and the judicial system, absolute judicial immunity. The state defendants also requested costs and attorney's fees. Travelers moved for summary judgment based on *res judicata* and/or collateral estoppel, frivolity, lack of subject matter jurisdiction, and improper venue. Travelers sought a transfer of venue to Minnesota in the alternative. Hirman moved for summary judgment based on frivolity, lack of subject matter jurisdiction, and improper venue. Hirman also sought transfer of venue in the alternative. Olmsted County, Schmitz, Mundahl, C.O. Brown and Norwest sought dismissal based on lack of personal jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. With respect to

Schmitz and Mundahl, defendants sought dismissal based on absolute prosecutorial immunity, and with respect to C.O. Brown, defendants sought dismissal on *res judicata* grounds. [*10] Metmor Financial, Inc. ("Metmor") sought dismissal based on lack of personal jurisdiction, lack of subject matter jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. Finally, Restovich moved for dismissal based on lack of personal jurisdiction. [5]

> 4   The court has also received three additional motions returnable May 22, 1995. The first -- from Judges Davies, Klaphake, Challeen, Collins and Chief Judge Simonett requests summary judgment dismissing the complaint based on lack of personal jurisdiction. The second by Western Union also requests summary judgment based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. The third, by British Airways, also requests dismissal based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. All three motions are mooted by this memorandum-decision and order which dismisses the complaint in its entirety against nonmoving defendants for failure to state a claim on which relief can be granted.

> 5   The court also received an affidavit and memorandum of law in support of summary judgment from J.C. Penney. However, the documents were not accompanied by a notice of motion.

[*11] Four defendants, British Airways, Kuwait, Prudential, and Youngquist, sought vacatur of the defaults entered against them. Prudential coupled its request with a request for an order enjoining plaintiff from filing or intervening in any litigation against Youngquist also requested dismissal of the complaint based on lack of personal jurisdiction and lack of subject matter jurisdiction.

## ANALYSIS

### The Defaults

We vacate the defaults entered in this matter because plaintiff improperly served defendants. Each application for entry of default shows service by certified mail, which is not permitted by relevant federal, New York or Minnesota rules. [HN1] Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. *Fed. R. Civ. P. 4(e)(2).* Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. *Fed.* [*12] *R. Civ. P.*

*4(e)(1).* [HN2] Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. *Fed. R. Civ. P. 4(h)(1)* and *4(e)(1).* [HN3] Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *See* N.Y. Civ. Prac. L. & R. §§ 308, 311 (McKinney Supp. 1995); *N.Y. Bus. Corp. Law § 306* (McKinney Supp. 1995); *Minn. Stat. § 543.08* (1995); Minn. R. 4.03 (1995). Finally, [HN4] service on states, municipal corporations or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. *Fed. R. Civ. P. 4(j)(2).* Minnesota law does not authorize service on a governmental entity by certified mail. *See* Minn. [*13] R. 4.03(d) and (e) (1995).

We therefore grant the motions by British Airways, Prudential, Kuwait, and Youngquist to vacate the defaults entered against them based both on the defective service and also on the meritorious defenses discussed below. We vacate *sua sponte* the entries of default against MSI, Ford, First Bank Rochester and TCF, all of whom were served improperly and preserved the service issue by raising it or declining to waive it. Concomitantly, we deny Pourzandvakil's motion for a default judgment against J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways and TCF. We vacate *sua sponte* the entry of default against J. C. Penney, which preserved the issue of service in its answer. By moving to dismiss or for summary judgment without raising the issue of service, Judge Mork may have waived the service issue. However Judge Mork objected to personal jurisdiction as inconsistent with due process and otherwise presented meritorious defenses. We therefore treat his motion for summary judgment as including a motion to vacate the entry of default and accordingly grant it.

## II. The Jurisdictional Arguments

In addition to raising various [*14] other grounds for dismissal, such as plaintiff's failure to state a claim on which relief can be granted and *res judicata,* most of the moving defendants urge (1) that this court lacks jurisdiction over either their persons or the subject matter of the controversy or (2) that this action is improperly venued. As we must, we examine jurisdiction and venue first.

### A. Personal Jurisdiction

Maki, the state defendants, Olmsted County,

Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich and Youngquist each allege that this court cannot exercise personal jurisdiction over them consistent with due process constraints. In support of their motions, these defendants present affidavits showing that they have had no significant contacts with the state of New York relevant to this lawsuit and that their contacts with Pourzandvakil all occurred in Minnesota. Nothing in plaintiff's voluminous submissions links any of these defendants with New York. [HN5] Plaintiff's extraterritorial service of process can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York State; (2) if the defendant [*15] is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to *Rule 14* or *Rule 19 of the Federal Rules of Civil Procedure* and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be subject to jurisdiction in the courts of general jurisdiction in any state of the United States. *Fed. R. Civ. P. 4(k)*. Defendants are not subject to federal interpleader jurisdiction and they were not joined pursuant to *Rule 14* or *Rule 19*. In addition, no federal long-arm statute is argued as a basis for jurisdiction, and the moving defendants all would be subject to jurisdiction in Minnesota. Therefore, we must look to New York's long-arm statute to determine whether plaintiff's extraterritorial service of process could be effective under the one ground remaining pursuant to *Rule 4(k). See N.Y. Civ. Prac. L. & R. § 302* (McKinney Supp. 1995). [HN6] This rule provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain [*16] minimal contacts between the defendant and the state (such as transacting any business in the state) and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact. *Id. § 302(a)*. The moving defendants have demonstrated that plaintiff does not claim harm stemming from acts or contacts within the purview of *Section 302(a)*. Therefore, we grant these defendants' motions to dismiss the complaint for lack of personal jurisdiction.

## B. Subject Matter Jurisdiction

Pourzandvakil's complaint does not contain the jurisdictional allegations required by *Fed. R. Civ. P. 8(a)(1)*. Several defendants move for dismissal based either on this pleading defect or on an affirmative claim that no subject matter jurisdiction exists. Commercial, Travelers and Hirman (collectively, the "moving insurance companies") moved for dismissal because plaintiff has not pled the complete diversity of citizenship required for subject matter jurisdiction. The state defendants, relying on *District of Columbia Court of Appeals v. Feldman*, argue that we lack subject matter jurisdiction over any issue that was determined in a state court proceeding to which plaintiff [*17] was a party. *District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 482, 75 L. Ed. 2d 206, 103 S. Ct. 1303 (1983)*. These issues include plaintiff's hospitalization at St. Peter Regional Treatment Center. Finally, Metmor also moved for dismissal based on lack of subject matter jurisdiction because plaintiff has failed to plead a jurisdictional basis.

The moving insurance companies note correctly that insofar as the claims against them can be deciphered, plaintiff states that Traveler's and Commercial did not pay for damages to Pourzandvakil's property, harassed her and cancelled her policy. Pourzandvakil does not mention Hirman in her complaint, but Hirman's attorney states that Pourzandvakil informed him in a telephone conversation that her complaint against Hirman stemmed from actions it took as an agent of Travelers in denying Pourzandvakil's 1985 property damage claim.

The moving insurance companies argue that this court has no jurisdiction over the state insurance law claims absent complete diversity of citizenship between plaintiff and the defendants. *28 U.S.C. § 1332*. They point out that plaintiff lists a Syracuse, New York address for herself and that Kuwait's [*18] address as listed in the complaint is also in New York. Therefore, they argue, there is no complete diversity and this court lacks subject matter jurisdiction absent a basis for pendent jurisdiction under *28 U.S.C. § 1367(a). Section 1367(a)* [HN7] requires a relationship between the state and federal claims so that "they form part of the same case or controversy." *Id*. Because plaintiff's claims of denial of insurance coverage bear no apparent relationship to her other claims of rape, torture, harassment and kidnapping, we do not believe that an adequate basis for supplemental jurisdiction exists. *Id*. Plaintiff's complaint therefore shows no basis for subject matter jurisdiction against the moving insurance companies, and we dismiss as against them. [6]

> 6    We ordinarily would offer plaintiff an opportunity to amend her complaint because her submissions and Kuwait's answer indicate two bases on which plaintiff might be able to argue diversity of citizenship. First, although plaintiff lists her address in Syracuse, New York, she also has indicated on the civil cover sheet that she is an Iranian Citizen and we are not aware of her residence status. As a permanent resident, she would be deemed a citizen of the state in which she resides. *28 U.S.C. § 1332(a)*. However, if she lacks permanent resident status, her citizenship would be considered diverse from that of all the defendants. *Id. § 1332(a)(2)*. Second, Kuwait has submitted an answer in which it claims to be a foreign state within the meaning of *28 U.S.C. §*

*1603*. If Kuwait is correct, plaintiff may have an independent basis for jurisdiction over Kuwait. *See 28 U.S.C. § 1330*. If Pourzandvakil could show subject matter jurisdiction over Kuwait without resort to diversity of citizenship, then Kuwait's residence in New York may not be relevant to the issue of whether this court has diversity jurisdiction under *Section 1332. Cf. Hiram Walker & Sons, Inc. v. Kirk Line, 877 F.2d 1508, 1511-1512 (11th Cir. 1989), cert. denied, 131 L. Ed. 2d 219, 115 S. Ct. 1362 (1995)* (holding that the joinder of a non-diverse defendant sued under federal question jurisdiction did not destroy diversity as to the remaining defendant). Here, however, plaintiff's complaint is subject to so many other meritorious defenses -- including complete failure to state a cause of action -- that an amendment would be an exercise in futility. Additionally, plaintiff has not requested permission to amend, proffered an amended pleading, or indeed even supplied an affidavit stating her residency status or alleging a basis of jurisdiction over her claims against Kuwait other than diversity under *28 U.S.C. § 1332*.

[*19] We also agree with the state defendants that state court decisions may render certain of plaintiff's claims against them unreviewable either because of *res judicata* or lack of subject matter jurisdiction. However, because plaintiff's claims are so generally stated and so lacking in specifics, we are unable to discern at this juncture what parts of her complaint would be outside the jurisdiction of the court. In any case, we already have determined that the state defendants are clearly entitled to dismissal on personal jurisdiction grounds. As for Metmor, we believe that plaintiff may be attempting to state a civil rights claim by alleging a conspiracy to murder in connection with a judge although she fails to articulate an actionable claim. We note that we already have determined, in any case, that Metmor is entitled to dismissal on personal jurisdiction grounds.

## C. Venue

Metmor, Travelers, Maki, Hirman, Norwest, Olmsted County, C.O. Brown, Schmitz and Mundahl also allege that Pourzandvakil's action is not properly venued in this court. Although these defendants are entitled to dismissal on independent grounds, improper venue also would support dismissal as to these defendants. [*20] The general venue statute provides that a diversity action, except as otherwise provided by law, may be brought only in

[HN8] (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

*28 U.S.C. § 1391(a). Section 1391(b)* provides that federal question actions, except as otherwise provided by law, may be brought only in

[HN9] (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

[*21] *Id. § 1391(b)*. The majority of the defendants in this action are residents of Minnesota and all of the events of which Pourzandvakil complains occurred in Minnesota. No defendant resides in the Northern District of New York, and none of the conduct plaintiff complains of occurred in this district. Therefore, venue in the Northern District of New York is clearly improper. [HN10] Where venue is laid in the wrong district, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *Id. § 1406(a)*. Because, as we will explain below, Pourzandvakil's complaint not only fails to state a claim upon which relief can be granted but is also frivolous, we do not deem it to be in the interest of justice to transfer this case to another district. [HN11] The purpose of the court's discretionary authority to transfer rather than dismiss in cases of improperly laid venue is "to eliminate impediments to the timely disposition of cases and controversies on their merits." *Minnette v. Time Warner, 997 F.2d 1023, 1027 (2d Cir. 1993)* (holding that it was an improper exercise of discretion to dismiss rather than transfer [*22] when the statute of limitations on a timely filed complaint ran between filing and dismissal). In this case, as discussed below, a review of the complaint and the plaintiff's submissions on these motions indicates that her claims are frivolous. We therefore dismiss as to the moving defendants both on venue grounds and on the other grounds already identified as applicable. We note also that plaintiff has made claims similar to those in this action against many of the same defendants in the United

States District Court for the District of Minnesota. *Pourzandvakil v. Price,* Civ No. 4-93-207 (D.Minn. 1993). This action was dismissed by Order to Show Cause entered April 12, 1993.

### III. Failure to State a Claim on Which Relief Can be Granted and Frivolity

Defendants ASI, Travelers, Hirman, Norwest, C.O. Brown, Olmsted County, Schmitz, Mundahl, Prudential, Metmor, and Youngquist as well as the state defendants have attacked the sufficiency of plaintiff's complaint. Travelers and Hirman urge that the complaint is frivolous while the remaining defendants argue only that the complaint fails to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6).* [7] [HN12] We already [*23] have dismissed against all the moving parties except ASI on jurisdictional grounds and therefore have the power to address the *Rule 12(b)(6)* issue only on ASI's motion. *See Bell v. Hood, 327 U.S. 678, 682-83, 90 L. Ed. 939, 66 S. Ct. 773 (1946)* (subject matter jurisdiction); *Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963)* (personal jurisdiction). We grant ASI's motion and note in passing that were we empowered to reach the merits regarding the remaining moving defendants, we also would dismiss the complaint against them for failure to state a claim upon which relief can be granted. We also dismiss *sua sponte* as frivolous the complaint against all defendants who have not been granted dismissal previously on jurisdictional grounds.

> 7    J.C. Penney also submits an affidavit requesting dismissal on this basis and others, but has not filed or served a notice of motion.

Pourzandvakil has not specified a statutory or constitutional basis for her claims against ASI or any of the other [*24] defendants. She alleges that certain of the insurance company defendants denied her claims for damages without alleging that the denial was in any respect wrongful. She also alleges in general terms that the defendants harassed, tortured, kidnapped and raped her and perhaps were involved in a murder plot but does not supply (1) the dates on which these actions occurred, except to say that they began in 1984 and 1985; (2) the names of the specific defendants involved in any particular conduct; or (3) a description of any particular conduct constituting the harassment, torture or kidnapping. She suggests without further detail that ASI was involved in a plot to murder her by placing her in the Mayo Clinic. Although plaintiff does not allege specific constitutional provisions or statutes that defendants have violated, we assume -- largely because many of the defendants involved are state officials or state employees and she appears to complain of certain aspects of various trials -- that she wishes to complain of violations of her civil rights. [HN13] Complaints that rely on civil rights statutes are insufficient unless "they contain some specific allegations of fact indicating a deprivation [*25]

of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams, 810 F.2d 358, 363 (2d Cir. 1987).* [HN14] A *pro se* plaintiff's complaint must be construed liberally and should be dismissed only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Estelle v. Gamble, 429 U.S. 97, 106, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976)* (quotation omitted). Pourzandvakil has not satisfied even this minimal test; her complaint and submissions on this motion demonstrate that she cannot prove any set of facts in support of her claim which would entitle her to relief. Her complaint consists of a "litany of general conclusions" rather than "specific allegations of fact". *Barr, 810 F.2d at 363.*

Ordinarily we would allow plaintiff an opportunity to replead to state specific allegations against ASI, but three factors militate against this course of action. First, our December 22, 1994, Memorandum - Decision and Order denying plaintiff's request for a temporary restraining order indicated that she had not shown a likelihood of success on the merits of her claim because she had not [*26] pled any specific actionable facts. Despite the fact that plaintiff since has filed three amended complaints, she still fails to set forth specific actionable conduct. Second, the defendants' motions themselves have alerted plaintiff to the need to show specific actionable facts, and yet her voluminous submissions in opposition to the motions contain no specific actionable facts. Finally, plaintiff has asserted similar allegations against many of the same defendants sued in this action -- although not ASI -- as well as others in several different jurisdictions. *See Pourzandvakil v. Blackman,* [8] Civ. No. 94-C944 (D.D.C. 1994), *Pourzandvakil v. Doty* (E.D.N.Y. 1993), *Pourzandvakil v. Price,* Civ. No. 7 (D.Minn. 1993). Where the results are known to us these actions resulted in dismissals for failure to state a claim upon which relief can be granted. *Pourzandvakil v. Price,* Civ. No. 4-93-207, Order to Show Cause entered April 12, 1993; *Pourzandvakil v Blackman,* Civ. No. 94-C-94, Order entered April 28, 1994, *aff'd* Civ. No. 94-5139 (D.C. Cir. 1994) (per curiam). In the Minnesota case, dismissal took place after the district court offered plaintiff an opportunity to [*27] amend her pleading and plaintiff still was not able to offer specifics. [9] [HN15] Even *pro se* complaints must show "some minimum level of factual support for their claims." *Pourzandvakil v. Blackman,* Civ. No. 94-C-94, (quoting *White v. White, 886 F.2d 721, 724 (4th Cir. 1989)).* We therefore dismiss plaintiff's complaint against ASI for failure to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6).*

> 8    Former Supreme Court Justice Harry A. Blackmun.
>
> 9    We note also that plaintiff has not requested leave to amend in this action.

We note that in *Pourzandvakil v. Blackman,* Judge John H. Pratt dismissed plaintiff's *in forma pauperis* complaint *sua sponte* under *28 U.S.C. § 1915(d)*, holding both that it failed to state a claim on which relief can be granted and that it was frivolous. We consider here whether we have the authority to dismiss *sua sponte* plaintiff's complaint, which was not filed *in forma pauperis,* as frivolous as against all non-moving defendants. [*28] [HN16] The Supreme Court explicitly has acknowledged a district court's power under *Section 1915(d)* to dismiss as frivolous a complaint which "lacks an arguable basis either in law or in fact." *Neitzke v. Williams, 490 U.S. 319, 325, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1989).* The Supreme Court explicitly declined to rule, however, on whether a district court has the authority to dismiss *sua sponte* frivolous complaints filed by non-indigent plaintiffs. *Id. at 329 n.8.* The law in this circuit is that a district court may *sua sponte* dismiss a frivolous complaint even if the plaintiff has paid the filing fee. *See Tyler v. Carter, 151 F.R.D. 537, 540 (S.D.N.Y. 1993), aff'd 41 F.3d 1500 (2d Cir. 1994); cf. Pillay v. I.N.S., 45 F.3d 14, 17 (2d Cir. 1995) (per curiam)* (dismissing *sua sponte* appeal for which appellant had paid normal filing fee). We believe that *sua sponte* dismissal is appropriate and necessary here because (1) plaintiff's claims lack an arguable basis in law and fact; (2) plaintiff has repeatedly attempted to replead her claims without being able to articulate actionable conduct; (3) some of plaintiff's claims have been tested in other courts [*29] and found to be without merit; and (4) the issue of frivolity has been presented by at least some of the moving defendants.

We therefore dismiss with prejudice plaintiff's complaint as frivolous as to all defendants -- regardless of whether they have moved for dismissal -- that have not been granted dismissal on jurisdictional grounds. We direct the clerk to return plaintiff's filing fee to her. *Tyler, 151 F.R.D. at 540.*

### IV. Requests for Sanctions, Costs, Attorney's Fees and Injunction Against Filing Further Actions

Because plaintiff is *pro se* and appears to have a belief in the legitimacy of her complaint, we do not believe that the purpose of Rule 11 would be served by awarding sanctions. *See Carlin v. Gold Hawk Joint Venture, 778 F. Supp. 686, 694-695 (S.D.N.Y. 1991).* Moreover, her litigiousness has not yet reached the point

at which courts in this circuit have justified injunctive relief. *See id. at 694* (and collected cases). We therefore deny the requests of ASI and Prudential for injunctive relief. Our refusal to grant sanctions and injunctive relief however, is conditioned on this dismissal putting an end to plaintiff's attempts to sue these defendants [*30] on these claims in this forum. Any further attempts by plaintiff to revive these claims will result in our revisiting the issue of sanctions. *Id. at 695.*

## CONCLUSION

All defaults entered by the clerk are vacated. Plaintiff's complaint is dismissed in its entirety against all moving and non-moving defendants. The dismissal of the complaint against Maki, the state defendants, Olmsted County, Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich, Youngquist, Commercial, Travelers and Hirman is without prejudice as it is premised on this court's lack of power either over the person of the defendant or the subject matter of the controversy. *See Voisin's Oyster House, Inc. v. Guidry, 799 F.2d 183, 188-9 (5th Cir. 1986)* (dismissal for lack of subject matter jurisdiction is not a dismissal on the merits); *John Birch Soc'y. v. National Broadcasting Co., 377 F.2d 194, 199 n.3 (2d Cir. 1967)* (dismissal for lack of subject matter jurisdiction implies no view of merits); *Orange Theatre Corp. v. Rayherstz Amusement Corp., 139 F.2d 871, 875 (3d Cir.) cert. denied, 322 U.S. 740, 88 L. Ed. 1573, 64 S. Ct. 1057 (1944)* (dismissal for lack of personal jurisdiction is not [*31] a dismissal on the merits). The dismissals against the remaining defendants are with prejudice. All requests for sanctions and attorney's fees are denied. The requests of defendants ASI and Prudential for an injunction with respect to future litigation is denied. However, plaintiff is cautioned that any litigation in this forum attempting to revive the claims addressed herein may subject her to sanctions. Plaintiff's motions are denied as moot.

IT IS SO ORDERED.

DATE: May 22, 1995

Syracuse, New York

ROSEMARY S. POOLER

UNITED STATES DISTRICT JUDGE



Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

H

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier
Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy,
and Christopher P. Artuz, Defendants.
**No. 01CIV.8235(AGS).**

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

**\*1** Maurice Samuels alleges that while incarcerated at the Green Haven Correctional Facility,[FN1] prison officials searched his cell and confiscated a number of documents which were deemed to be "subversive" and contraband. Samuels claims that the materials, including theological textbook excerpts, were of a Christian nature and were used in a course he taught in the prison through the New York Theological Seminary. Samuels' alleged possession of these documents led to a misbehavior report and a subsequent disciplinary hearing, for which Samuels was sentenced to 180 days in keeplock and 180 days' loss of packages, commissary privileges, and telephone use. Samuels also alleges that instead of being punished as per his disciplinary hearing, he was sentenced to a more severe punishment, 180 days in a special housing unit which entailed Samuels' being locked in his cell for twenty-three hours per day. On the basis of the allegedly unlawful sanctions to which he was subjected, Samuels has filed the instant action pursuant to 42 U.S.C. § 1983 alleging violations of, *inter alia,* his First Amendment and due process rights, and seeks equitable relief and damages.

Defendants have filed a motion to dismiss the action pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue that they enjoy qualified immunity barring this suit. For the reasons set forth below, defendants' motion is granted in part and denied in part.

FN1. Defendants repeatedly state that the events giving rise to this action arose while Samuels was incarcerated at the Great Meadow Correctional Facility. Samuels states that the events in question happened at the Green Haven Correctional Facility. Moreover, Samuels' evidence, including the Inmate Disciplinary Report (Exhibit H), the Disciplinary Hearing Record Sheet (Exhibit O), and the Superintendent Hearing Disposition Report (Exhibit P) all note the Green Haven Correctional Facility. In light of the above, the Court determines that defendants' position that the events occurred at Great Meadow is incorrect. The Green Haven Correctional Facility is located in Dutchess County in the Southern District, while Great Meadow is located in Washington County in the Northern District. Defendants make no argument regarding the Court's jurisdiction with respect to the location of the events in question.

II. Factual Background [FN2]

FN2. Unless otherwise indicated, the facts set forth below are gleaned from Samuels' submissions, because on a FED. R. CIV. P. 12(b)(1) or (6) motion, the adjudicating court must assume as true factual allegations made in the complaint. Defendants concede this fact. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, at 4. It should also be noted that Samuels brings this action *pro se.* As such, it is sometimes difficult to understand fully his contentions. Accordingly, the Court reads the (sometimes confusing) factual allegations in the light most favorable to Samuels.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. FN3 While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. FN4 At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?,* SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

FN4. *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

**\*2** a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

> FN5. While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work

in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

> FN6. The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opisitions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf.[FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

**FN7.** *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

**FN8.** Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999.[FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre,[FN10] summarized his findings as follows:

**FN9.** Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

**FN10.** The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements made in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days.[FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"),

at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

> [FN11.] Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**\*5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally-and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13] *See id.*

> FN12. Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

> FN13. No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

> FN14. In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

III. Legal Standard

A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his]

claim[s] which would entitle [him] to relief." ' *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146; *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

*6 Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

IV. Legal Analysis

A. Exhaustion of Administrative Remedies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). *See Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. *See* Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

**\*7** As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at \*2-\*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled "Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

FN15. The real damage suffered by Samuels

was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122921 (S.D.N.Y. Jan. 29, 2002), is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [ § 1997e(a) ][FN16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

FN16. The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at *2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at \*21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at \*15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.[FN17]

> [FN17.] The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special

housing unit for 180 days.

3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.[FN18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> [FN18.] There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See Flanagan,* 2002 WL 122921, at \*2. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002) (noting that in the Second Circuit, confinement in a special

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

B. Due Process

1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of

which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [FN19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at \*22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Walker,* at \*21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at \*21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at \*21.

> FN19. As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at \*22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). At the same time, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With respect to Tier III hearings such as the one at issue here, the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals";

(3) the inmate be judged by a fair and impartial hearing officer;

(4) the disciplinary conviction be supported by some evidence; and

(5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal citations omitted)).

**2. Whether Samuels Received the Process Due Him**

Defendants concede that Samuels was entitled to the aforementioned rights under *Wolff. See* Reply Brief, at 13. They argue, however, that Samuels received all the procedural safeguards due him. Before analyzing defendants points in detail, the Court notes the paucity of the record before it. While Samuels has provided nearly fifty exhibits, defendants have provided only a two-page affidavit by Inmate Grievance Program Director Thomas G. Eagen dated March 13, 2002, attached to which is a nine-line computer printout of what purports to be

Samuels' grievance file. Defendants have failed to submit, *inter alia,* a transcript of the disciplinary hearing, a transcript or audio recording of the confidential witness statements, a written basis for the rejection of Samuels' witnesses, or a copy of the documents that were supposedly seized from Samuels' cell. While the Court is cognizant of the fact that the instant motion is not one for summary judgment, without these and other documents, it is difficult for this Court fully to evaluate the merits of the parties' arguments. More troubling is the fact that this is apparently not the first time an inmate has been sentenced to a special housing unit on the basis of evidence which has not been preserved for judicial review. Indeed, in *Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS 9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by defendants, the court noted that on more than one occasion, Selsky was forced to reverse his previous decision denying an inmate's appeal because the "record of [the disciplinary] hearing was incomplete and the 'confidential tape' was 'unavailable for judicial review.' " *Id.* at *9 (citation omitted). On the occasion cited by the *Cherry* court, the inmate's record was expunged, but only after the plaintiff had served 125 days in a special housing unit. *See id.* at *9.

**a. Witnesses**

*12 Samuels argues that his due process rights were violated because he was not permitted to call Dr. Peter-Raoul as a witness at his disciplinary hearing. *See* Complaint, at 9; Ex. V, at 2. Defendants state, without explanation, that "it is clear that the proffered testimony would have been irrelevant and redundant." Motion Brief, at 13. The Court agrees with defendants that the right of an inmate to call witnesses in his defense is not limitless. Nevertheless, prison authorities' failure to allow an inmate to call a witness may be grounds for reversal, where the authorities fail to justify their actions. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). In this case, Dr. Peter-Raoul was apparently the author of some or all of the "subversive" materials and had close ties to the theological seminary program at the prison. According to Samuels, she also "assisted plaintiff with his course syllabus and provided much of the material utilized" therein. Complaint, at 9. She was therefore in a unique position to explain the appropriateness and relevance of the materials allegedly possessed by Samuels, who had in fact argued that the materials in question were issued to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. FN20 Dismissal is therefore inappropriate.

> FN20. Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.' " *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient evidence.

c. Assistance Provided by the Employee Assistant

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

"limited" assistance to which Samuels is entitled.[FN21] Such a failure potentially implicates Samuels' due process rights. *See Ayers v. Ryan,* 152 F.3d 77, 80-81 (2d Cir.1998). Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

> FN21. By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

**d. Actions of the Hearing Officer**

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

**e. Timeliness of the Hearing**

**\*14** Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a). In this case, Samuels' rights were not violated.

The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g., Harris v. Goord,* 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000) (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

**f. Notice**

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g., Abdur-Raheem v. Goord,* 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

**C. Retaliation**

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g.,* Poe v. Leonard, 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g.,* Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." Colon, 58 F.3d at 873.

FN22. Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

supervisor.

3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition.*" Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

7. Jeffery McKoy

**\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the

misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known." ' *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.